## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT WICHITA

Hibu Inc., )
)
               Plaintiff, )
)   Case No. 16-cv-01055-JTM-TJJ
v. )
)
Chad Peck, )
)
              Defendant. )
)

 

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF UNCONTROVERTED FACTS ...............................................4

    A.    Mr. Peck's 2006 employment agreement with Yellow Book USA.......................5

    B.    The key provisions of Mr. Peck's 2006 Agreement. ..............................................6

    C.    Yellow Book USA withdraws from business in Kansas in 2009 and ceases to exist altogether in 2011. ..................................................................................8

    D.    In January 2015, Hibu terminates Mr. Peck without cause, and Mr. Peck strictly adheres to the post-employment restrictions in the 2006 Agreement. ..........................................................................................................10

    E.    In January 2016, the Restricted Period ends and Mr. Peck asks the Sales Representatives to join his sales team at Dex Media...........................................12

ARGUMENTS AND AUTHORITIES.................................................................14

I.      HIBU'S BREACH OF CONTRACT CLAIM (COUNT I) FAILS BECAUSE HIBU IS NOT A PARTY TO THE 2006 AGREEMENT AND THERE IS NO EVIDENCE OF A BREACH.........................................................................15

    A.    Hibu is not a party to the 2006 Agreement and cannot enforce its terms. ............15

    B.    Hibu's contract claim fails for the additional reason that there is no evidence that Mr. Peck breached the 2006 Agreement........................................20

          1.    There is no evidence that Mr. Peck breached the Customer Solicitation Provision. ..........................................................................21

          2.    There is no evidence that Mr. Peck breached the Non-Compete Provision. ...........................................................................................22

          3.    There is no evidence that Mr. Peck breached the Employee Solicitation Provision. ..........................................................................26

    C.    Hibu has waived its claim that Peck breached the Non-Disclosure Provision.............................................................................................................30

II.    HIBU'S CLAIM FOR TORTIOUS INTERFERENCE WITH HIBU'S "BUSINESS EXPECTANCY" (COUNT II) FAILS AS A MATTER OF LAW. ...........30

CONCLUSION.................................................................................................35

CORE/3502715.0002/134395955.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adams v. Am. Guar. & Liab. Co.*,
  233 F.3d 1242 (10th Cir. 2000)..............................................................14

*Adler v. Wal-Mart Stores, Inc.*,
  144 F.3d 664 (10th Cir. 1998) ...............................................................14

*Allen, Gibbs & Houlik, L.C. v. Ristow*,
  32 Kan. App. 2d 1051, 94 P.3d 724 (Kan. Ct. App. 2004) ...................22

*Arthur J. Gallagher & Co. v. Anthony*,
  No. 16-CV-00284, 2016 WL 4523104 (N.D. Ohio Aug. 30, 2016)......................29

*Avisena, Inc. v. Santalo*,
  65 So. 3d 14 (Fla. Dist. Ct. App. 2011).........................................24, 25

*Babbar v. Ebadi*,
  36 F. Supp. 2d 1269 (D. Kan. 1998) ......................................................31

*Berardi's Fresh Roast, Inc. v. PMD Enterprises, Inc.*,
  2008-Ohio-5470 .....................................................................................24

*Brooks Automation, Inc. v. Blueshift Techs., Inc.*,
  69 Mass. App. Ct. 1107, 868 N.E.2d 953 (2007)...................................24

*Bruno Int'l Ltd. v. Vicor Corp.*,
  No. CV 14-10037-DPW, 2015 WL 5447652 (D. Mass. Sept. 16, 2015)..............................33

*Burcham v. Unison Bancorp, Inc.*,
  276 Kan. 393, 77 P.3d 130 (2003) .........................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................15

*Conaway v. Smith*,
  853 F.2d 789 (10th Cir. 1988) ...............................................................15

*Dalton v. Yellow Book USA*,
  No. 1:09-CV-297-TLS (N.D. Ind. Feb. 8, 2012) .............................16, 17

*Digital Ally, Inc. v. Corum*,
  No. 17-CV-02026-DDC-GLR, 2017 WL 1545671 (D. Kan. Apr. 28, 2017) .................22, 23

CORE/3502715.0002/134395955.1

*DP-Tek, Inc. v. AT&T Global Information Co.*,
   891 F. Supp. 1510 (D. Kan. 1995) ......................................................................32

*Feldt v. Kan-Du Const. Corp.*,
   No. CIV.A. 12-1064-MLB, 2014 WL 4725245 (D. Kan. Sept. 23, 2014), *aff'd
   sub nom.*, 655 F. App'x 669 (10th Cir. 2016).......................................................19

*Gleeson v. Preferred Sourcing, LLC*,
   883 N.E.2d 164 (Ind. Ct. App. 2008) ..................................................................23

*H & R Block, Inc. v. Lovelace*,
   208 Kan. 538, 493 P.2d 205 (1972) .....................................................................22

*Harllee v. Prof'l Serv. Indus., Inc.*,
   619 So. 2d 298 (Fla. Dist. Ct. App. 1992) ...........................................................25

*Harnett v. Parris*,
   925 F. Supp. 1496 (D. Kan. 1996) .......................................................................15

*Indep. Stave Co., LLC v. Bethel*,
   No. 2:16-CV-31, 2016 WL 362313 (S.D. Ohio Jan. 29, 2016).............................23

*Indiana Autobody Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   No. 614CV6001ORL31TBS, 2016 WL 7183290 (M.D. Fla. Feb. 26, 2016),
   *report and recommendation adopted*, No. 614CV6001ORL31TBS, 2016 WL
   3208396 (M.D. Fla. June 10, 2016) ......................................................................32

*Jackson v. Kansas Cty. Ass'n Multiline Pool*,
   No. 03-4181-JAR, 2006 WL 963838 (D. Kan. Apr. 10, 2006) .........................2, 31

*MacKenzie v. City and County of Denver*,
   414 F.3d 1266 (10th Cir. 2005)............................................................................14

*Manual Woodworkers & Weavers, Inc. v. Rug Barn, Inc.*,
   No. 1:00CV284-C, 2001 WL 1672253 (W.D.N.C. Dec. 19, 2001)......................23

*Matrai v. AM Entm't, LLC*,
   No. 14-2022-SAC, 2015 WL 1646214 (D. Kan. Apr. 14, 2015)...........................34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .............................................................................................14

*Medispec, Ltd. v. Chouinard*,
   133 F. Supp. 3d 771 (D. Md. 2015) ......................................................................23

*Merck & Co. Inc. v. Lyon*,
   941 F. Supp. 1443 (M.D.N.C. 1996).....................................................................23

CORE/3502715.0002/134395955.1

*Mitchell v. City of Moore, Okla.*,
218 F.3d 1190 (10th Cir. 2000).........................................................................14

*Mowery Clinic, L.L.C. v. Hofer*,
122 P.3d 838 (Kan. Ct. App. 2005)....................................................................25

*Navigant Consulting, Inc. v. Wilkinson*,
508 F.3d 277 (5th Cir. 2007) .............................................................................25

*Ossur Holdings, Inc. v. Bellacure, Inc.*,
No. C05-1552JLR, 2006 WL 2401269 (W.D. Wash. Aug. 18, 2006)..................24

*Peavey Elecs. Corp. v. Pinske*,
No. CIV.A.4:10CV69TSLLRA, 2010 WL 2243562 (S.D. Miss. June 1, 2010)...................23

*Petroleum Energy v. Mid–America Petroleum*,
775 F. Supp. 1420 (D. Kan. 1991) .....................................................................33

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*,
LLC, 813 F. Supp. 2d 489 (S.D.N.Y. 2011).......................................................23

*Rodriguez v. ECRI Shared Servs.*,
984 F. Supp. 1363 (D. Kan. 1997) .....................................................................34

*Schumacher v. Morris*,
219 P.3d 1243 (Kan. Ct. App. 2009)...................................................................15

*Scientific Enters., Inc. v. George*,
47 Va. Cir. 9 (Fairfax Cir. Ct. 1998) ..................................................................24

*Shane v. Log Star Homes of Am., Inc.*,
No. 6:14-CV-01273-JTM, 2016 WL 7242517 (D. Kan. Dec. 15, 2016) ..............15

*Spaulding v. United Transp. Union*,
279 F.3d 901 (10th Cir. 2002) ...........................................................................14

*Thom v. Bristol-Myers Squibb Co.*,
353 F.3d 848 (10th Cir. 2003) ...........................................................................14

*TKO Energy Servs., LLC v. M-I L.L.C.*,
No. 12-CV-108-GKF-PJC, 2013 WL 789458 (N.D. Okla. Mar. 4, 2013), *aff'd*,
539 F. App'x 866 (10th Cir. 2013) .....................................................................32

*Towle v. Flexel Corp.*,
867 F. Supp. 954 (D. Kan. 1994), *aff'd*, 68 F.3d 484 (10th Cir. 1995)..................21

*Wade v. EMCASCO Ins. Co.*,
483 F.3d 657 (10th Cir. 2007) ...........................................................................16

iv

*Weber v. Tillman*,
  259 Kan. 457, 913 P.2d 84 (Kan. 1996) ...............................................................................22

*Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*,
  45 F. Supp. 2d 1165 (D. Kan. 1999) .....................................................................................34

*Wolfson v. Nutt*,
  No. CIV.A. 08-3190-GLR, 2011 WL 5900812 (D. Kan. Nov. 23, 2011) .............................16

*Yellow Book USA, Inc. et al v. Brandeberry, et al.*,
  Case No. 3:10-cv-025, 2010 WL 4250705 (S.D. Ohio July 13, 2010) .................................17

*Zenith Petroleum Corp. v. Steerman*,
  656 F. App'x 885 (10th Cir. 2016) .......................................................................................17

v

## PRELIMINARY STATEMENT

Not content with just terminating defendant Chad Peck's employment, plaintiff hibu Inc. ("Hibu"), a yellow pages publisher, now seeks to cripple him financially for accepting alternate employment with one of the few remaining yellow pages publishers still in existence. It has recently come to light, however, that Hibu is not even a party to the decade-old employment agreement that forms the basis of its claims against Mr. Peck. Worse yet, after roughly two years of discovery, Hibu has failed to adduce a single item of evidence to support its conclusory allegations that Mr. Peck breached any of the restrictive covenants in this obsolete employment agreement. The time has come to put an end to Hibu's baseless and vindictive litigation campaign against Mr. Peck. Thus, Mr. Peck now moves for summary judgment.

Hibu's first claim, for breach of contract, fails in the first instance because Hibu has failed to establish the existence of a valid employment agreement between Hibu and Mr. Peck. The 2006 employment agreement that Hibu seeks to enforce is between Mr. Peck and a company called Yellow Book USA, Inc. and, as discovery has shown, Yellow Book USA, Inc. is a different corporate entity than Hibu. And to the extent Hibu now seeks to argue that it supplanted Yellow Book USA, Inc. as Mr. Peck's counterparty, this argument is barred by the terms of the 2006 agreement, which prohibits any change to the agreement without Mr. Peck's written consent.

Not only is Hibu unable to show that it is a party to the 2006 employment agreement, it is unable to show that Mr. Peck breached the non-solicitation or non-compete provisions of that agreement. As for the non-solicitation provision, there is no evidence that Mr. Peck solicited Hibu's customers or employees during the twelve-month restricted period; in fact, when it comes to Hibu's employees, the evidence affirmatively shows that Mr. Peck did ***not*** solicit them to join

his new employer, Dex Media, Inc., during this period.   As one Hibu sales representative testified:

> Q.    Prior to January 4th, 2016, had Chad Peck said or done anything to recruit you to leave hibu and go with him at Dex?
>
> A.    No, sir. Not at all. Again, he didn't want to violate his employment agreement, and he didn't want to jeopardize any of his friends and previous coworkers. Very, very, very adamant about that.

(*See* Riekenberg Dep. 31:10-17.)   As for the non-compete provision, the most that Hibu can show is that Mr. Peck **prepared** to compete with Hibu during the 12-month restricted period, and the law is clear that preparing to compete, as opposed to actually competing, does not violate an agreement not to compete.

Hibu's second claim, for tortious interference with business expectancy, fails for a series of reasons, the most obvious of which is that there is no such thing as tortious interference with an at-will employment relationship.  *Jackson v. Kansas Cty. Ass'n Multiline Pool*, No. 03-4181-JAR, 2006 WL 963838, at *19 (D. Kan. Apr. 10, 2006) ("[S]everal cases in this Court have held that an at-will employment relationship cannot support a tortious interference with a contract claim or a tortious interference with a business expectancy claim.").   Equally unavailing is Hibu's theory that Mr. Peck tortiously interfered with Hibu's prospective business relationships by directing Hibu's employees to solicit Hibu's customers.  The first defect with this claim is that Hibu cannot point to a single customer that supposedly refused to enter into a business relationship with Hibu as a result of Mr. Peck's supposed interference.  Moreover, there is no evidence to support Hibu's conclusory allegations of Mr. Peck's supposed misconduct; to the contrary, the evidence rebuts those allegations.  Nor is there any evidence that Mr. Peck acted with the requisite malice towards Hibu rather than in his own self-interests.  For any and all of these reasons, the tortious interference claim fails.

CORE/3502715.0002/134395955.1

Hibu had ample opportunity to uncover evidence to support its conclusory allegations against Mr. Peck but failed to do so.  Accordingly, Mr. Peck respectfully requests that the Court enter summary judgment in his favor.

CORE/3502715.0002/134395955.1

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of Defendant's Motion for Summary Judgment, the following facts are uncontroverted and constitute all material facts necessary for decision on this Motion.

1.      Plaintiff hibu Inc. is a digital and print media marketing and advertising company. (Complaint ("Compl.") ¶ 5.)

2.      Defendant Chad Peck is a resident of Wichita, Kansas and has worked in the yellow pages industry for nearly twenty years.  (Ex. A, Declaration of Chad Peck ("Peck Decl.") ¶ 1.)[1]

3.      Mr. Peck began working in the yellow pages industry in 2000 when he joined a company named Feist Publications Inc.  (*Id.* ¶ 3.)

4.      While at Feist, Mr. Peck worked as a sales representative and was tasked with selling yellow pages ads to small and local businesses.  (*Id.*)

5.      On or about February 3, 2004, Feist was acquired by a national yellow pages directories publisher named, Yellow Book USA, Inc. ("Yellow Book USA").  (Ex. B, March 25, 2004, *Yellow Book USA Acquires Feist Publications, Inc.* Press Release.)

6.      Following Yellow Book USA's acquisition of Feist Publications, Mr. Peck became an employee of Yellow Book USA on or about February 3, 2004.  (Peck Decl. ¶ 4.)

7.      In or around 2006, Mr. Peck was promoted to the position of sales manager at Yellow Book USA.  (*Id.* ¶ 5.)  As a sales manager, Mr. Peck was responsible for overseeing a team of sales representatives who were tasked with selling Yellow Book USA's advertising products to customers.  (*Id.*)

---

[1]      Unless otherwise stated herein, all references to "Ex. __" refer to exhibits attached to the Declaration of Travis Quick filed herewith, all emphasis is added, and all internal quotations and citations have been omitted.

4

**A.    Mr. Peck's 2006 employment agreement with Yellow Book USA.**

8.     On or about May 23, 2006, Yellow Book USA presented Mr. Peck with an employment agreement, which Mr. Peck executed.  (*See* Ex. C, May 23, 2006 Employee Agreement (the "2006 Agreement" or "Agreement"); Peck Decl. ¶ 6.)

9.     The parties to the 2006 Agreement are Mr. Peck and Yellow Book USA.  (Compl. ¶ 9 n.1 ("The Agreement identifies the parties as Peck and 'Yellow Book USA, Inc.'").)

10.    The Agreement confirms that Mr. Peck's counterparty under the Agreement is Yellow Book USA.  The Agreement states that it is "between YELLOW BOOK USA, INC." and the "Employee named herein" (Mr. Peck); the Agreement bears a single logo in its letterhead that states "YELLOW BOOK USA"; and the Agreement was executed by Patti Seda on behalf of "Yellow Book USA, Inc."  (*See* 2006 Agreement at 1, 3.)

11.    At the time the 2006 Agreement was executed, Hibu was known as "Yellow Book Sales and Distribution Company, Inc." ("Yellow Book Sales and Distribution") (Ex. D, Aug. 9, 2016, Hibu Certificate of Ownership and Merger § 1.)

12.    When he executed the 2006 Agreement, Mr. Peck's understanding was that, under the 2006 Agreement, he was employed by Yellow Book USA.  (Peck Decl. ¶ 6.)

13.    At that time, Yellow Book USA and Yellow Book Sales and Distribution were separate corporate entities with separate corporate identification numbers and separate boards of directors.   Yellow Book USA was incorporated on October 29, 1996 with the Delaware corporate identification number of 2678103.   (Ex. E, Yellow Book USA Articles of Incorporation.)  As of March 31, 2006, its board of directors was comprised of John Condron, John Davis and Joseph Walsh.  (Ex. F, Yellow Book USA 2006 Kansas Annual Report.)

14.    Yellow Book Sales and Distribution was incorporated on March 5, 2004 with the Delaware corporate identification number of 3773422.   (Ex. G, Yellow Book Sales and

5

Distribution Articles of Incorporation.)  As of March 31, 2006, its only director of Yellow Book Sales and Distribution was Joseph Walsh.  (Ex. H, Yellow Book Sales and Distribution 2006 Kansas Annual Report.)

**B.**    **The key provisions of Mr. Peck's 2006 Agreement.**

15.    The 2006 Agreement contained a series of post-employment restrictions that are pertinent to this case:   <u>First</u>, the 2006 Agreement contained a customer non-solicitation provision, which states that, for a one-year period after the termination of Mr. Peck's employment, Mr. Peck would not be permitted to "directly or indirectly solicit, call upon or service, or in any other manner divert or take away or attempt to divert or take away from the Company . . . any customer whose account [he] serviced or supervised during" the year before his termination (the "<u>Customer Solicitation Provision</u>").  (2006 Agreement § 1.)

16.    <u>Second</u>, the 2006 Agreement contained a non-compete provision, which states that, for a one-year period after the termination of Mr. Peck's employment, Mr. Peck is not permitted to "directly or indirectly engage or become interested in (a) any business in the Territory . . . that engages in the yellow pages directory publishing business, or (b) any other business in the Territory that competes with the yellow pages directory publishing business or the internet advertising business of the Company" (the "<u>Non-Compete Provision</u>" or "<u>Non-Compete</u>").  (*Id.* § 3.)  The "Territory" is defined as "those Yellow Book markets where you have been a manager at any time during the eighteen (18) month period immediately preceding the termination of your employment."  (*Id.*)

17.    <u>Third</u>, the 2006 Agreement contained an employee non-solicitation provision stating that, for a one-year period after the termination of Mr. Peck's employment, Mr. Peck shall not "directly or indirectly (on [his] own behalf or in cooperation with any other person or

6

entity) employ or retain or solicit the employment or retention" of any Hibu employee (the "Employee Solicitation Period").  (*Id.* § 4.)

18.     The 2006 Agreement contained an anti-modification provision that stated:  "This agreement cannot be changed or terminated except in writing signed by you [Mr. Peck] and a duly authorized officer of the Company."  (2006 Agreement § 8(c).)

19.     Mr. Peck understood Section 8(c) of the 2006 Agreement to mean what it says—namely, that any change to his employment, including a new job title, compensation, responsibilities, or employer would require the parties to agree to the change in writing, or execute a new agreement entirely.  (Peck Decl. ¶ 7.)

20.     No one ever asked Mr. Peck to consent to any change to the 2006 Agreement. (*Id.* ¶ 8.)  Nor did Mr. Peck ever consent to any change to the 2006 Agreement, in writing or otherwise.  (*Id.*)

21.     Mr. Peck testified that he signed "[m]ultiple" other employment agreements after the 2006 Agreement.  (Ex. I, Sept. 20, 2016 Deposition Transcript of Chad Peck ("Peck Dep.") 72:17-24.)  Specifically, Mr. Peck testified:

> Q. What's the last employee agreement with hibu that you believe
> you signed?  What's the date of it?
>
> A. I believe either 2012 or 2013.
>
> Q.  Did you produce that in discovery?  Do you have a copy of it
> and did you produce it in discovery?
>
> A. No. I do not have a copy.
>
> Q. Okay.  Why do you believe you had signed one in 2012?
>
> A. It was protocol that we sign them every 12 months to 18
> months with Yellow Book and/or hibu.

> Q. I understand that you recall some sort of protocol.  But do you have a specific memory of signing an agreement on a specific date?
>
> A. I have a specific memory of signing.  Not a specific date.
>
> Q. Okay.   When do you think you signed this subsequent agreement?
>
> A. It would have been the spring of '12 or spring of '13 would have been the latest.  And there would have been probably two to three prior to that.

(*Id.* at 96:7-97:5.)

22.    The documentary evidence corroborates Mr. Peck's testimony that he signed "[m]ultiple" other employment agreements after the 2006 Agreement.  For example, on or about July 18, 2007, Yellow Book USA sent Mr. Peck a letter confirming his "new position of Area General Sales Manager" and setting forth his new "compensation package."  The letter asked Mr. Peck to "read, agree and sign the attached Employment Agreement upon acceptance of this position."  (Ex. J, July 18, 2007 Letter (hibu_001929).)  Plaintiff has never produced a copy of the Employment Agreement attached to the July 18, 2007 letter.

### C.    Yellow Book USA withdraws from business in Kansas in 2009 and ceases to exist altogether in 2011.

23.    On June 23, 2009, Yellow Book USA filed an Amendment of Withdrawal with the Kansas Secretary of State, formally withdrawing its authority to transact business in Kansas—where Mr. Peck lived and worked.  (Ex. K, Yellow Book USA Kansas Amendment of Withdrawal.)  There is no evidence of Yellow Book USA ever re-applying for authorization to transact business in Kansas.

24.    On March 31, 2011, Yellow Book USA merged with and into Yellow Book Sales & Distribution and ceased to exist.  (Ex. L, Yellow Book Certificate of Merger at 2.)  Following this transaction, Yellow Book Sales and Distribution changed its name to Yellowbook Inc.  (*Id.*)

8

25.     On or about March 4, 2011, just a few days before Yellow Book USA ceased to exist, Mr. Peck received a letter from Yellow Book Sales and Distribution "to confirm [his] change in position to General Sales Manager, effective March 14, 2011" and setting forth Mr. Peck's new compensation package.  (Ex. M, March 4, 2011 Yellow Book Sales and Distribution Letter (hibu_001940).)  The letter asked Mr. Peck to "review and sign this letter and the attached Employee Agreement, as per our company policy for management personnel."  (*Id.*)

26.     Mr. Peck signed the March 4, 2011 letter, and believes he also signed the attached Employee Agreement.  (Peck Decl. ¶ 9.)  Plaintiff has never produced a copy of the Employee Agreement attached to the March 4, 2011 letter.

27.     On January 16, 2013, Yellowbook Inc. changed its name to "hibu Inc."  (Ex. D, Aug. 9, 2016, Hibu Certificate of Ownership and Merger.)  The corporate history of hibu Inc. can be summarized as follows:

> Yellow Book Sales and Distribution Company, Inc. ⟶ Yellowbook Inc. ⟶ hibu Inc.

28.     On or about January 27, 2014, Hibu sent Mr. Peck another letter "to confirm [his] change in position to Regional Director, effective February 3, 2014," and setting forth his new compensation package.  (Ex. N, January 27, 2014 Letter (hibu_002493).)  The letter states:  "By signing this letter, you also agree that your Employee Agreement continues in full force and effect and that your employment with the company is governed by the terms of the hibu Employee Handbook."  (*Id.*)

29.     Hibu concedes that "the operative documents related to Hibu's breach of contract claim" in this case are "the most recent, executed Employee Agreements" for Mr. Peck and the Sales Representatives.  (*See* Dkt. No. 210 at 4.)

9

**D.**  **In January 2015, Hibu terminates Mr. Peck without cause, and Mr. Peck strictly adheres to the post-employment restrictions in the 2006 Agreement.**

30.  Hibu terminated Mr. Peck's employment without cause on January 2, 2015.  (Pre-Trial Order, Dkt. No. 251 ("PTO") at 3.)

31.  Immediately before Mr. Peck's termination, the Hibu sales team that he managed included Lance Flowers, Ricky Baker, Kira Kimbro, Brooke Peck, Monica Russell, and Brad Winfrey (the "Sales Representatives").  (Peck Decl. ¶ 11.)

32.  Following his termination, Mr. Peck worked in an unrelated industry for the first half of 2015.  *(Id.* ¶ 12.)

33.  In mid-2015, Mr. Peck began discussions with Dex Media about potential job opportunities.  *(Id.)*

34.  In August 2015, Dex Media officially offered Mr. Peck employment as a Director—Expansion Channel.  *(Id.)*

35.  A strict condition of Dex Media's employment offer to Mr. Peck was that Mr. Peck would honor the contractual obligations, if any, he owed to Hibu.  *(Id.*; Ex. O, Dex Media Aug. 5, 2016 Offer Letter.)

36.  Under Hibu's theory that the 2006 Agreement is the "operative" agreement, the Customer Solicitation, Non-Compete, and Employee Solicitation Provisions would have restricted Mr. Peck for a one-year period beginning on January 2, 2015 and ending on January 2, 2016 (the "Restricted Period").  *(See* 2006 Agreement.)

37.  During the Restricted Period, Mr. Peck did not contact any Hibu or other known yellow pages customers.  (Peck Decl. ¶ 13; Ex. P, Rule 30(b)(6) Deposition Transcript of Jeff Johanns ("Johanns Dep.") 83:3-7.)

38.     During the Restricted Period, Mr. Peck did not make, or attempt to make, any sale of any yellow pages or advertising product anywhere in Kansas or Oklahoma.  (Peck Decl. ¶ 13.) Nor did Mr. Peck oversee, or manage, any sales team at any point during the Restricted Period. (*Id*.)

39.     For the entirety of the Restricted Period, Mr. Peck was employed by Dex Media as a sales trainer for markets outside of Kansas.  (*Id*.)

40.     At certain points in 2015, Mr. Peck had some high-level discussions with individuals at Dex Media about possible expansion plans for certain markets in Kansas.  (*Id*. ¶ 14.)

41.     All of the discussions Mr. Peck had in this regard related solely to potential plans for expansion in the future—none of which was scheduled to begin until after the Restricted Period.  (*Id*.)

42.     As it turns out, none of the expansion plans for the Kansas market that Mr. Peck discussed with Dex Media during 2015 was ultimately adopted.  (*Id*. ¶ 15.)  The actual expansion plans that Dex Media employed for Kansas were changed significantly in February 2016 and thereafter.  (*Id*.)

43.     During the Restricted Period, Mr. Peck did not solicit the Sales Representatives or any Hibu employees to join him at Dex Media.  (*Id*. ¶ 16; Ex. Q, Deposition Transcript of Randall Riekenberg ("Riekenberg Dep.") 31:10-17; Ex. R, Deposition Transcript of Michael Ball ("Ball Dep.") 18:12-19; Ex. S, Deposition Transcript of Christopher Hett ("Hett Dep.") 74:21-75:2; 94:14-17.)

CORE/3502715.0002/134395955.1

44.     While Mr. Peck was in contact with the Sales Representatives and other Hibu employees (including his wife, Brooke Peck) in 2015, Mr. Peck never solicited any Hibu employee to leave Hibu or to come work for Dex Media.  (Peck Decl. ¶ 17.)

45.     There is no evidence of a single communication between Mr. Peck and a Sales Representative during the Restricted Period where Mr. Peck asked the Sales Representative to leave Hibu or join Dex Media.  (*Id.*)

46.     To the contrary, the evidence is undisputed that whenever Hibu employees would ask Mr. Peck about his job at Dex Media, Mr. Peck would inform them that he was not permitted to discuss such issues.   (*Id.*; Ex. T, Deposition Transcript of Brooke Peck ("B. Peck Dep.") 81:23-82:6; Ex. U, Deposition Transcript of Lance Flowers ("Flowers Dep.") 85:20-87:5; Ex. V, Deposition Transcript of Ricky Baker ("Baker Dep.") 37:22-25; Ex. W, Deposition Transcript of Kara Kimbro ("Kimbro Dep.") 71:2-74:8; Hett Dep. 37:18-25, 86:13-22; Ball Dep. 51:14-25.)

**E.      In January 2016, the Restricted Period ends and Mr. Peck asks the Sales Representatives to join his sales team at Dex Media.**

47.     Mr. Peck did not ask any of the Sales Representatives to leave Hibu or join Dex Media until January 4, 2016, at the earliest.   (Ex. X, Declaration of Brooke Peck ("B. Peck Decl.") ¶ 7; Ex. Y, Declaration of Ricky Baker ("Baker Decl.") ¶ 7; Ex. Z, Declaration of Kara Kimbro ("Kimbro Decl.") ¶ 7; Ex. AA, Declaration of Lance Flowers ("Flowers Decl." ¶ 7; Ex. BB, Declaration of Bradley Winfrey ("Winfrey Decl.") ¶ 7; Ex. CC, Deposition Transcript of Monica Russell ("Russell Dep.") 121:1-10.)

48.     The Sales Representatives left Hibu to join Dex Media in mid-January and February 2016—after the Restricted Period.  (B. Peck Decl. ¶¶ 8-9; Baker Decl. ¶¶ 8-9; Kimbro Decl. ¶¶ 8-9; Flowers Decl. ¶ 8; Winfrey Decl. ¶ 8; Russell Dep. 121:1-10, 200:4-5.)

12

49.     Both Mr. Peck and Dex Media instructed the Sales Representatives to abide by whatever obligations they owed to Hibu.  (Peck Decl. ¶ 20; *see also* Kimbro Dep. 16:23-17:10; Flowers Dep. 195:11-17.)

50.     Once employed by Dex Media, the Sales Representatives were placed on Mr. Peck's sales team.  (Peck Decl. ¶ 20.)

51.     Mr. Peck was responsible for assigning client accounts to each member of his sales team, including the Sales Representatives.  (*Id.* ¶ 21.)

52.     Knowing that the Sales Representatives had prior contact with clients while at Hibu, Mr. Peck took specific steps to ensure that none of the Sales Representatives was assigned any client accounts that they had ever serviced while at Hibu.  (*Id.*; *see also* Kimbro Dep. 14:3-17; Flowers Dep. 19:10-24; Russell Dep. 126:9-127:5.)

53.     Mr. Peck's sales team did not begin making sales calls on behalf of Dex Media until late March 2016.  (Peck Decl. ¶ 22.)

54.     The first sale that Mr. Peck or anyone on his sales team made on behalf of Dex Media occurred no earlier than the first week of April 2016—more than three months after the Restricted Period.  (*Id.*)

CORE/3502715.0002/134395955.1

## ARGUMENTS AND AUTHORITIES

"Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*  While the Court should "consider the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment," "[u]nsupported conclusory allegations," standing alone, "do not create an issue of fact." *MacKenzie*, 414 F.3d at 1273.

The moving party—here, Mr. Peck—bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).  To meet this standard, the moving party need not disprove the nonmoving party's claims; rather, the moving party need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citation omitted).  Once the movant has met this initial burden, the nonmovant—here, Hibu—must then set forth specific facts showing that there is a genuine issue for trial. *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmovant may not rely on mere allegations in its pleadings, but instead must "set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)).

14

Importantly, summary judgment is not a "disfavored procedural shortcut"; to the contrary, it is "an important procedure designed 'to secure the just, speedy and inexpensive determination of every action.'  *Harnett v. Parris*, 925 F. Supp. 1496, 1499 (D. Kan. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Thus, in responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

I.   **HIBU'S BREACH OF CONTRACT CLAIM (COUNT I) FAILS BECAUSE HIBU IS NOT A PARTY TO THE 2006 AGREEMENT AND THERE IS NO EVIDENCE OF A BREACH.**

Hibu's breach of contract claim is premised on the allegation that "[o]n May 23, 2006, Peck entered into the Agreement **with hibu**" and that Mr. Peck breached that Agreement. (Compl. ¶ 9.)  Discovery, however, has disproved this allegation at every turn.  For one thing, it is now clear that Mr. Peck did not enter into the Agreement with Hibu; he entered into the Agreement with Yellow Book USA, a separate entity.  Moreover, Hibu has failed to adduce *any* evidence that Mr. Peck breached the 2006 Agreement, let alone evidence sufficient to create a genuine issue of material fact.  Either of these reasons, standing alone, is sufficient to warrant dismissal of Hibu's contract claim.

A.   **Hibu is not a party to the 2006 Agreement and cannot enforce its terms.**

"In order to state a claim for breach of contract under Kansas law, one of the elements the plaintiff must establish is the existence of a contract between the parties."  *Shane v. Log Star Homes of Am., Inc.*, No. 6:14-CV-01273-JTM, 2016 WL 7242517, at *7 (D. Kan. Dec. 15, 2016); *Schumacher v. Morris*, 219 P.3d 1243 (Kan. Ct. App. 2009) (plaintiff bears the burden of

15

proof regarding "the existence of a contract between the parties").[2]  Here, Hibu's contract claim

against Mr. Peck fails for the simple reason that Hibu is not a party to the 2006 Agreement and,

as such, cannot enforce it.  *Wolfson v. Nutt*, No. CIV.A. 08-3190-GLR, 2011 WL 5900812, at *2

(D. Kan. Nov. 23, 2011) ("In Kansas, ***only parties to the contract may enforce the contract***

because the person who possesses the [contractual] right sought to be enforced is the real party in

interest.") (citing *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 675 (10th Cir. 2007)).  The only

parties to the 2006 Agreement were (1) Mr. Peck and (2) "Yellow Book USA, Inc."  This is

evident from the face of the 2006 Agreement, the very first sentence of which states in no

uncertain terms that it is "between ***YELLOW BOOK USA, INC.***, a Delaware corporation, and

the Employee named herein."  (*See* 2006 Agreement at 1.)  And the only signatories to the 2006

Agreement are Mr. Peck and Patti Seda, who signed on behalf of "YELLOW BOOK USA,

INC."  (*Id.* at 3.)  Thus, as a matter of law, the only entity that can enforce the 2006 Agreement

against Mr. Peck is Yellow Book USA.  *Wolfson*, 2011 WL 5900812, at *2.

In its Complaint, Hibu concedes that the 2006 Agreement "identifies the parties as Peck

and 'Yellow Book USA, Inc.'"  (Compl. ¶ 9 n.1.)  But then the Complaint alleges that "hibu was

formerly known as Yellow Book USA, Inc."  (*Id.*)  Hibu's allegation is simply not true.  Hibu

has never been known as Yellow Book USA.  Instead, Hibu previously was known as

Yellowbook Inc., and before that, it was known as Yellow Book Sales and Distribution

Company.  (Ex. D, Aug. 9, 2016, Hibu Certificate of Ownership and Merger.)  But Yellow Book

USA was a different corporate entity.

Interestingly, in other proceedings in other federal courts, Hibu has embraced the

corporate separateness of Hibu and Yellow Book USA.  For example, in *Dalton v. Yellow Book*

---

[2]     The parties agree that Kansas law governs the "substantive issues in this case."  (PTO § 1(d).)

*USA*, No. 1:09-CV-297-TLS (N.D. Ind. Feb. 8, 2012), an employment dispute in the Northern District of Indiana, the plaintiff named "Yellow Book USA" as the defendant.  Hibu (then known as "Yellowbook Inc.") appeared in the case and moved for summary judgment.  *See Dalton*, No. 1:09-CV-297-TLS, Dkt. No. 36.  Far from asserting that Hibu was "formerly known as" Yellow Book USA or that they were the same entity, Hibu certified to the district court in *Dalton* that "[t]he Complaint improperly identified the Defendant [Hibu] as Yellow Book USA."  *Id.* at 1 n.1.  In view of its prior sworn representations in a separate federal court proceeding, Hibu cannot now credibly tell this Court that it "was formerly known as Yellow Book USA, Inc." Similarly, in *Yellow Book USA, Inc. et al v. Brandeberry, et al.*, Case No. 3:10-cv-025, 2010 WL 4250705 (S.D. Ohio July 13, 2010), Yellow Book USA and Yellow Book Sales and Distribution together filed a trademark lawsuit in the Southern District of Ohio.  Rather than representing that they were a single corporate entity, however, Yellow Book USA and Yellow Book Sales and Distribution made clear that they were two separate "Plaintiffs."  *See id.* ¶ 2.

Any attempt by Hibu to now argue that it somehow became the party to the 2006 Agreement—either by merger, assignment or some other corporate change—would fail as a matter of law.  In the first instance, Hibu's theory in this case, as alleged in the Complaint and confirmed in the Pretrial Order, is that Mr. Peck "***entered into*** the [2006] Agreement with hibu." (Compl. ¶ 9; PTO at 9.)  This Pretrial Order is the document that "defines the scope of litigation*."  Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016). Having staked out the position in the Pretrial Order that Hibu itself was the party that "entered into" the 2006 Agreement, Hibu cannot now switch theories and claim that it was the assignee or successor-in-interest to that Agreement.  *Id.* at 886-87 ("Claims, issues, defenses, or theories of damages not included in the pretrial order are waived.").

17

Equally important, the language of the 2006 Agreement expressly bars any attempt by Hibu to substitute itself in as a new counterparty to that Agreement. As noted, the 2006 Agreement's anti-modification provision states: "This agreement cannot be changed or terminated except in writing signed by you [Mr. Peck] and a duly authorized officer of the Company." (2006 Agreement § 8(c).) This language is notably broader than the typical anti-modification provision, which bars only changes to the "terms of the agreement." The 2006 Agreement, by contrast, bars any changes to "[t]his agreement"—there are no exceptions, limitations, or carve outs. And it is hard to imagine a more fundamental change to an employment agreement than a change to the identity of the employer. Thus, neither Hibu nor any of its predecessors could have become the counterparty to the 2006 Agreement without Mr. Peck's written consent. It is undisputed that such consent was never sought and never received. (Peck Decl. ¶ 8.)

Rather than seeking Mr. Peck's consent to change the counterparty under the 2006 Agreement, the record shows that Hibu simply presented Mr. Peck with a new employment agreement from a new employer. Specifically, on or about March 4, 2011, just before Yellow Book USA was merged out of existence, Hibu's predecessor, Yellow Book Sales and Distribution, asked Mr. Peck to review and sign a new "Employee Agreement." (Ex. M, March 4, 2011 Yellow Book Sales and Distribution Letter (hibu_001940).) Plainly, if Hibu (or its predecessor) was the party that had "entered into" the 2006 Agreement, as it now suggests, there would have been no need for Hibu to ask Mr. Peck to sign a new Employee Agreement. Yet, that is precisely what Hibu did, thereby confirming that Hibu itself recognized that it was not a party to the 2006 Agreement. The fact that Hibu cannot now produce a copy of the Employee Agreement it sent Mr. Peck in 2011, or any of Mr. Peck's other employment agreements, is a

18

problem of Hibu's own creation.  And it is not a problem that Hibu can solve merely by claiming to be the counterparty to a 2006 Agreement that it never signed and Mr. Peck never consented to change.

To prevail on its contract claim, Hibu was required to "establish the existence of a contract between the parties."  *Feldt v. Kan-Du Const. Corp.*, No. CIV.A. 12-1064-MLB, 2014 WL 4725245, at *6 (D. Kan. Sept. 23, 2014)), *aff'd sub nom.*, 655 F. App'x 669 (10th Cir. 2016).  This Hibu cannot do.  Hibu has only established the existence of a contract between Mr. Peck and Yellow Book USA, which Hibu has admitted under penalty of perjury is a different entity.  Thus, there is no genuine dispute in this case that Hibu "did not sign the agreement and [its] name is not listed as a party to" the 2006 Agreement and, as such, there can be no "issue of material fact as to whether [Hibu] was a party" to the Agreement entitled to enforce its terms. *See Feldt*, 2014 WL 4725245, at *6.

Hibu's own pleadings in this case confirm that, even if it were a party to the 2006 Agreement, that Agreement is no longer enforceable against Mr. Peck.  According to Hibu, the "operative" agreement for any employee is the "most recent, executed" agreement that he or she has signed:  "[T]he operative documents related to Hibu's breach of contract claim" are "the most recent, executed Employee Agreements" for Mr. Peck and the Sales Representatives.  (Dkt. No. 210 at 4.)  Indeed, as Hibu proclaims, "Hibu is not interested in basing its claims against Peck on anything but *the most recent, executed—and therefore enforceable*—Employee Agreement with him."  (*Id*. at 6.)

Here, the record evidence is undisputed that the 2006 Agreement is not "the most recent" employment agreement that Mr. Peck signed.  Rather, as Mr. Peck testified, he signed "[m]ultiple" other employment agreements *after* the 2006 Agreement.  (Peck Dep. 96:7-97:5.)

19

This testimony is not only undisputed, it is specifically corroborated by the documentary evidence. Hibu's own records indicate that, on at least four different occasions after 2006, Mr. Peck received employment letters from Hibu asking him to "read, agree, and sign" a new offer of employment and associated employment agreement. (*See* Ex. J, July 18, 2007 Letter (hibu_001929); Ex. M, March 4, 2011 Letter (hibu_001940); Ex. N, Jan. 27, 2014 Letter (hibu_002493); Ex. DD, June 5, 2014 Letter hibu_001953).) Mr. Peck signed "at least two or three" of these new employment agreements *after* the 2006 Agreement. (Peck Decl. ¶ 9.) Because the undisputed evidence shows that the 2006 Agreement is not Mr. Peck's "most recent, executed" agreement, then under Hibu's own legal criterion, the 2006 Agreement is not "enforceable" against him.[3]

### B. Hibu's contract claim fails for the additional reason that there is no evidence that Mr. Peck breached the 2006 Agreement.

Hibu's contract claim fails for the separate and independent reason that there is no evidence that Mr. Peck breached the 2006 Agreement. Hibu alleges that Mr. Peck breached three provisions of that Agreement: (1) the Customer Solicitation Provision; (2) the Non-Compete Provision; and (3) the Employee Solicitation Provision. (*See* PTO at 4-5.) But after nearly two years of discovery—in which the parties jointly produced thousands of pages of documents, served and answered 20 sets of written discovery requests, and took 21 separate depositions spanning more than 1,500 pages of transcripts—there is not a *shred* of evidence in the record that Mr. Peck did, or failed to do, anything to breach the 2006 Agreement. To the

---

[3]  Hibu has also taken the position that, even if Mr. Peck signed later employment agreements, the 2006 Agreement is still the "operative" agreement because it is the "most recent, signed Employee Agreement" for Mr. Peck *"in Hibu's files."* (Dkt. No. 199 at 3; Dkt. No. 210 at 3 (the "relevant" agreement is "the latest, executed Employee Agreement[] *in Hibu's possession, custody or control*").) This is silly. The question of which is the "operative" agreement in a series of agreements does not turn on which one of the agreements a party happens to maintain in its files. The fact that Hibu does not have the actual operative employment agreement for Mr. Peck does not mean it can simply enforce any version it does have.

20

contrary, the undisputed evidence proves beyond doubt that Mr. Peck diligently adhered to the provisions of the 2006 Agreement.  For this reason alone, Hibu's breach of contract claim fails.

> ### 1.  *There is no evidence that Mr. Peck breached the Customer Solicitation Provision.*

The Customer Solicitation Provision in the 2006 Agreement states that, during the Restricted Period, Mr. Peck could not "directly or indirectly solicit, call upon or service, or in any other manner divert or take away or attempt to divert or take away from the Company . . . any customer whose account [he] serviced or supervised during" the year before his termination.  (2006 Agreement § 2.)  There is no evidence that Mr. Peck ever breached this provision.

Far from establishing a breach, the undisputed record shows that Mr. Peck fully complied with the Customer Solicitation Provision.  For more than a full year after his termination, Mr. Peck did not even contact—much less "solicit, call upon or service"—any Hibu customers.  (Peck Decl. ¶ 13.)  In fact, Mr. Peck did not contact any known yellow pages customers until late January 2016, at the earliest.  (*Id.*)  There is no evidence to the contrary.  Hibu's 30(b)(6) witness on this very topic, Jeff Johanns, confirmed as much at his September 27, 2016 deposition:

> Q.  Are you aware of any documents, facts, or evidence that suggests that Chad had personal contact with any hibu customers during that 12-month period?
>
> A.  No.

(*See* Johanns Dep. 83: 3-7.)  Summary judgment is proper where, as here, "there is essentially no evidence" of the alleged breach.  *See Towle v. Flexel Corp.*, 867 F. Supp. 954, 959 (D. Kan. 1994), *aff'd,* 68 F.3d 484 (10th Cir. 1995).

     2.     ***There is no evidence that Mr. Peck breached the Non-Compete Provision.***

Hibu likewise has no evidence that Mr. Peck breached the Non-Compete Provision in the 2006 Agreement.  As a general rule, Kansas law looks upon non-compete clauses in employment contracts with "disfavor," and courts are "more reluctant to sustain or enforce" them than other types of restrictive covenants.  *See H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 545, 493 P.2d 205, 211 (1972).  Such clauses, as a rule, are "strictly construed against employers."  *Allen, Gibbs & Houlik, L.C. v. Ristow*, 32 Kan. App. 2d 1051, 1054, 94 P.3d 724, 726 (Kan. Ct. App. 2004).  Non-compete restrictions are only enforceable to the extent they are "reasonable" and "no greater than necessary to protect the employer's interests."  *Id.* at 729.  And not any interest will do.  Rather, "it is well settled that ***only a legitimate business interest*** may be protected by a noncompetition covenant."  *Weber v. Tillman*, 259 Kan. 457, 462, 913 P.2d 84, 89 (Kan. 1996).  "If the sole purpose [of a non-compete] is to avoid ordinary competition, it is unreasonable and unenforceable" as a matter of law.  *Id.*

Hibu first claims that Mr. Peck breached the Non-Compete Provision when he "accepted employment and began working for Dex Media" in August 2015.  (PTO at 4.)  This is a nonstarter.  It is well-settled that non-compete agreements that purport to restrict an employee from accepting employment with a competitor, without any reference to what the employee is actually doing for that employer, are *per se* unreasonable and cannot be enforced.  *See Digital Ally, Inc. v. Corum*, No. 17-CV-02026-DDC-GLR, 2017 WL 1545671 (D. Kan. Apr. 28, 2017).

The holding in *Digital Ally, Inc. v. Corum*, is directly on point.  In *Corum*, the defendant, Corum, signed a non-compete with his former employer, Digital Ally, which provided that "for a period of two years . . . employee will not directly or indirectly . . . [o]wn, manage, operate, control or have any interest, financial or otherwise," including as an "employee," of "any

22

business or enterprise which competes with the digital and electronic products of Digital Ally."
2017 WL 1545671, at *2. Thereafter, Corum left Digital Ally to work for a direct competitor,
TASER. *Id.* Digital Ally sought an injunction barring Corum from working for TASER. *Id.*
The *Corum* court denied the injunction, holding that the non-compete was unreasonable because,
among other things, it "prevent[ed] Mr. Corum from working in any capacity for any company
who one might consider plaintiff's competitor." *Id.* at *10. The decision in *Corum* is consistent
with scores of other decisions in which courts have refused to enforce non-competes that bar an
employee from working for a competitor "in any capacity." *See Indep. Stave Co., LLC v. Bethel*,
No. 2:16-CV-31, 2016 WL 362313, at *5 (S.D. Ohio Jan. 29, 2016) (refusing to enjoin employee
from "working at any competitor of Plaintiffs in any capacity"); *Medispec, Ltd. v. Chouinard*,
133 F. Supp. 3d 771, 775 (D. Md. 2015) (non-compete was unreasonable where it "would
broadly prohibit Defendant from being employed by, engaging with, or being connected to,
either directly or indirectly, any direct or indirect competitor of Medispec").[4] As these cases
make clear, the Non-Compete Provision in the 2006 Agreement cannot be construed as barring
Mr. Peck from working for a competitor. Thus, as a matter of law, the mere fact that Mr. Peck
accepted employment with Dex Media cannot support a claim for breach of contract.

Hibu next claims that Mr. Peck breached the Non-Compete Provision by "discuss[ing]
possible expansion plans" for certain Kansas markets with Dex Media in 2015. (PTO at 4.) This

---

[4]   *See also Manual Woodworkers & Weavers, Inc. v. Rug Barn, Inc.*, No. 1:00CV284-C, 2001 WL 1672253, at *5
(W.D.N.C. Dec. 19, 2001) ("If Coca–Cola used a non-compete similar to the one used in this case, its former
employees would be prohibited from not only manufacturing competing products worldwide, but from even
providing janitorial services."); *Peavey Elecs. Corp. v. Pinske*, No. CIV.A.4:10CV69TSLLRA, 2010 WL
2243562, at *5 (S.D. Miss. June 1, 2010) (employment by competitor did not violate non-compete where
plaintiff had "not shown that [defendant] attempted to lure clients away from [plaintiff], or that it has lost any
clients or is in serious danger of losing customers"); *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1460
(M.D.N.C. 1996) ("mere employment by a competitor alone" would not support entry of an injunction);
*Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 175 (Ind. Ct. App. 2008) (non-compete was unreasonable
where it did not take into account the services specifically provided by the employee); *Pure Power Boot Camp,
Inc. v. Warrior Fitness Boot Camp*, LLC, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (same).

claim likewise fails as a matter of law.  Under the Non-Compete Provision, Mr. Peck was not barred from preparing to compete with Hibu after the Restricted Period; he was only barred from competing with Hibu during the Restricted Period, and there is no evidence that he did that.

In the non-compete context, courts have recognized a distinction between "preparing to compete" and actually "competing." *See Berardi's Fresh Roast, Inc. v. PMD Enterprises, Inc.*, 2008-Ohio-5470, ¶¶ 29-33 ("'[P]reparing to compete' is not equivalent to 'competing.'"); *Scientific Enters., Inc. v. George*, 47 Va. Cir. 9, 14 (Fairfax Cir. Ct. 1998) ("[T]he policy in favor of free competition enables employees to prepare or make arrangements to compete with their employers without fear of violating their fiduciary duties").  Where, as here, the non-compete agreement does not state that it bars an employee from "preparing to compete," courts will not insert such a restriction into the agreement.  *See Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-1552JLR, 2006 WL 2401269, at *4 (W.D. Wash. Aug. 18, 2006) ("Össur could have written its non-competition provision to prevent Sterling from engaging in pre-market preparation.  It did not, and the court declines to construe any alleged ambiguity in Össur's favor.").  Instead, courts universally have held that, absent an express prohibition, an employee does not breach a non-compete merely by "preparing to compete."  *See Brooks Automation, Inc. v. Blueshift Techs., Inc.*, 69 Mass. App. Ct. 1107, 868 N.E.2d 953 (2007) ("No case in our jurisdiction stands for the proposition that a current or former employee, even one subject to a noncompetition agreement or a duty of loyalty, may not prepare to compete with his or her employer."); *Avisena, Inc. v. Santalo*, 65 So. 3d 14, 17 (Fla. Dist. Ct. App. 2011) (preparing to compete was not a breach of non-compete where "[t]here is no evidence in the record that

24

CareCloud solicited Avisena's customers or employees prior to expiration of the twelve-month Restricted period").[5]

Here, assuming Hibu can enforce the Agreement at all, the 2006 Agreement does not purport to bar Mr. Peck from "preparing" or "planning" to compete against Hibu after the Restricted Period.  (*See* 2006 Agreement § 3.)  By its own terms, the Non-Compete Provision is merely an agreement "Not to Compete" with Hibu in "Certain Markets."  (*Id.*)  Thus, to prove that Mr. Peck breached the Non-Compete Provision, Hibu must come forward with affirmative evidence that could allow a reasonable jury to find that Mr. Peck "was in actual competition" for Hibu's customers ***during*** the Restricted Period.  *See Mowery Clinic, L.L.C. v. Hofer*, 122 P.3d 838 (Kan. Ct. App. 2005) (employee did not violate non-compete unless her work for a competitor clinic involved "actual competition" for the former employer's patients).  Hibu cannot make such a showing.

The "possible expansion plans" that Hibu claims Mr. Peck discussed with Dex Media were not implemented during the Restricted Period; in fact, they were not implemented at all. (Peck Decl. ¶¶ 14-15.)  As the undisputed evidence shows, the discussions Mr. Peck had with Dex Media during the Restricted Period concerned plans that would only launch, if at all, well after the Restricted Period ended.  (*Id.*.)  The map of Dex Media's so-called expansion plans itself perfectly illustrates this point.  (*See* Ex. EE, Kansas Expansion Map (PECK000152).)  Of the four new "potential" Kansas markets listed on that map, the ***earliest*** "Start Date" was March 1, 2016—nearly two months ***after*** the Restricted Period ended.  (*Id.*)  The remainder would not

---

[5]   In fact, courts have held that even a ***current*** employee, who is subject to fiduciary duties of loyalty, may lawfully engage in "preparations for a future competing business."  *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 284 (5th Cir. 2007) ("Even the existence of a fiduciary relationship between employee and employer does not preclude the fiduciary from making preparations for a future competing business venture."); *Harllee v. Prof'l Serv. Indus., Inc.*, 619 So. 2d 298, 300 (Fla. Dist. Ct. App. 1992) ("[M]ere preparation to open a competing business does not violate the employee's duty of loyalty and does not constitute tortious interference.").

launch until late 2016 or early 2017.  (*Id.*)  Equally important, the expansion plans that Mr. Peck discussed with Dex Media during the Restricted Period were scrapped in early 2016 and never came to fruition.  (*Id.* ¶ 15.)  The expansion plans that Dex Media eventually implemented in Kansas are markedly different from the plans that were discussed during the Restricted Period. (*Id.* ¶ 15.)  This evidence, all of which is undisputed, shows that there is no triable issue of fact as to whether Mr. Peck engaged in "actual competition" with Hibu during the Restricted Period in violation of the Non-Compete Provision.

### 3. *There is no evidence that Mr. Peck breached the Employee Solicitation Provision.*

The Employee Solicitation Provision in the 2006 Agreement states that during the Restricted Period, Mr. Peck shall not "directly or indirectly (on [his] own behalf or in cooperation with any other person or entity) employ or retain or solicit the employment or retention" of any Hibu employee.  (2006 Agreement § 4.)  For nearly two years, Hibu has pored over thousands of documents, emails, text messages and other communications produced by Mr. Peck, Dex Media, and the Sales Representatives looking to unearth some evidence of improper solicitation.  Hibu has also deposed all of the relevant witnesses, including all of the Sales Representatives and three depositions of Mr. Peck himself.  Yet, after all that, Hibu does not have evidence of a *single* communication—not one email, text, or phone call—from Mr. Peck to any of the Sales Representatives during the Restricted Period in which he asked them to leave Hibu, to come work for Dex Media, or anything even remotely close.

Not only is there no evidence to support Hibu's claim, all of the material evidence, once again, points the other way.  All six of the Sales Representatives that joined Dex Media have testified unequivocally that Mr. Peck did *nothing* to solicit them during the twelve-month Restricted Period.  (*See* B. Peck Decl. ¶ 6; Baker Decl. ¶ 7; Kimbro Decl. ¶ 7; Flowers Decl. ¶ 7;

26

Winfrey Decl. ¶ 7; Russell Dep. 109:2-111:20, 112:24-113:4, 121:1-10.)   Their testimony is

corroborated by Hibu's own witnesses, who confirmed that Mr. Peck diligently complied with

the Non-Solicitation Provision.   For example, Randy Riekenberg, a Hibu sales representative,

testified that Mr. Peck was "very, very, very adamant" about not violating his employment

agreement:

> Q.    Prior to January 4th, 2016, had Chad Peck said or done
> anything to recruit you to leave hibu and go with him at
> Dex?
>
> A.    No, sir. Not at all. Again, he didn't want to violate his
> employment agreement, and he didn't want to jeopardize
> any of his friends and previous coworkers. Very, very, very
> adamant about that.

(*See* Riekenberg Dep. 31:10-17.)  Hibu's other representatives gave similar testimony.  (S*ee also*

Ball Dep. 18:12-19 (same); Hett Dep. 74:21-75:2; 94:14-17 (same).)

Unable to identify any direct communications where Mr. Peck solicited any of the Sales

Representatives, Hibu instead points to three vague events that supposedly show improper

solicitation.  (PTO at 3-4.)  None of this supposed "evidence" creates a triable issue of fact as to

whether Peck breached the Non-Solicitation Provision.  **First**, Hibu claims that "[a]s early as

September 2015," Mr. Peck reached out to his "former colleagues at Hibu," although the only

Hibu employee named specifically is Chris Hett.  (PTO at 4.)  As a threshold matter, any alleged

solicitation of Mr. Hett is irrelevant to this case.  Hibu's claims relate only to Mr. Peck's alleged

solicitation of the Sales Representatives who left Hibu to join Dex Media, and Mr. Hett is not

one of them.  Even today, Mr. Hett still works at Hibu.  Putting that aside, there is no evidence of

any solicitation by Mr. Peck during these September 2015 discussions.  The Non-Solicitation

Provision, of course, does not prohibit Mr. Peck from speaking with Hibu employees; it prohibits

him from soliciting them.  And it is undisputed that, during those September 2015 discussions,

Mr. Peck never asked Mr. Hett or any Hibu employee to leave Hibu or come work for Dex Media.  (Peck Decl. ¶ 16.)  In fact, to the extent there was any conversation about working for Dex Media, it was Mr. Hett who contacted Mr. Peck to ask if there were employment opportunities at Dex Media; not the other way around.  (Hett Dep. 34:12-35:13.)  According to Mr. Hett himself, in response to these overtures, Mr. Peck refused to discuss employment opportunities with Mr. Hett, stating, "I can't talk to you about those" and referring him to Dex Media's human resources department.  (*Id.* at 37:18-25.)  Even after the one-year Restricted Period concluded on January 2, 2016, Mr. Peck did not reach out to Mr. Hett to ask him to join Dex Media.  (Peck Decl. ¶ 19.)  Not surprisingly, Mr. Hett remains a Hibu employee to this day.

**Second**, Hibu claims that "[i]n October 2015, Peck appeared at a gathering of his former Hibu colleagues in Salina, Kansas and discussed employment with Dex Media."  (PTO at 4.)  Hibu refers to a social get-together at a bar named "The Blind Pig" to watch a Kansas City Royals game, which Mr. Peck attended to surprise his wife, Brooke Peck.  (Peck Decl. ¶ 17; *see also* B. Peck Dep. 82:13-83:6; Flowers Dep. 84:21-85:7; Ex. V, Baker Dep. 36:3-17.)  Every single individual who attended that gathering—including the Sales Representatives and current Hibu employees—testified that no solicitation whatsoever occurred there.  (*See* B. Peck Dep. 81:23-82:6; Flowers Dep. 85:20-87:5; Baker Dep: 37:22-25; Kimbro Dep. 71:2-74:8.)  This was confirmed by Hibu's own witnesses who attended the gathering:

> Q.   You certainly never heard Chad say anything specifically that suggested he was trying to recruit or solicit the employees?
>
> A.   Not in the time I was there.
>
> Q.   And do you have any second-hand information suggesting that at some point during that meeting, although you did not hear it yourself, that Chad said or did anything to solicit or recruit any of the hibu folks?

> A.     I do not.

(Hett Dep. 86:13-22; *see also* Ball Dep. 51:14-25.)  In fact, when the topic of Mr. Peck's position

at Dex Media was raised, the evidence shows that Mr. Peck affirmatively avoided any further

discussion of Dex Media altogether:

> Q.     Were there discussions at The Blind Pig amongst the four
> of you regarding Chad being at Dex at that time?
>
> A.     At some point in time Mike Ball asked, so come on, Chad,
> what's going on at Dex?  And Chad said, I can't talk about
> it.

(Flowers Dep. 86:22-87:2.)  Mr. Peck had lunch with some of the Sales Representatives the next

day.  There was likewise no solicitation then.  (*See also id.* 90:8-10 ("Q. Any discussions of Dex

Media at that lunch [the next day]?  A. Zero.").)  No jury could find that Peck's mere attendance

at these social events somehow violated the Employee Solicitation Provision.  *See Arthur J.*

*Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *17 (N.D. Ohio Aug. 30,

2016) ("mere attendance at a sporting event" does not constitute solicitation).

**Third**, Hibu claims that "in late December 2015, Mr. Peck met with Hibu employees

individually to recruit them" to Dex Media.  (PTO at 4.)  Not only does Hibu have no evidence

of this event, it appears that Hibu simply made it up.  The record shows that Mr. Peck did not

even speak with the Sales Representatives (other than his wife) in December 2015, let alone meet

with them in person to recruit them to Dex Media.  (Peck Decl. ¶ 18; B. Peck Dep. 111:11-

112:24; Baker Dep. 147:14-17; Kimbro Dep. 104:19-105:4; Ex. FF Winfrey Dep. 67:5-68:20;

Ball Dep. 52:1-7; Russell Dep. 112:24-113:4; Flowers Dep. 91:20-92:2 ("Q. What about

discussions with Chad Peck during the time period from Salina to December?  A. I had no

conversations with Chad from that lunch period [in October 2015] until [January] the 4th when

he reached out to me. . . ."); *see also id.* at 92:3-11.)  The first time that Mr. Peck reached out to

any Sales Representatives to recruit them was on January 4, 2016—after the one-year restricted period had ended.  (Peck Decl. ¶ 19.)  There is no evidence to the contrary.

### C.     Hibu has waived its claim that Peck breached the Non-Disclosure Provision.

In its Complaint, Hibu originally alleged that Peck breached the Non-Disclosure Provision of the 2006 Agreement.  (Compl. ¶ 32.)  In the Pre-Trial Order, however, Hibu no longer asserts a breach of this provision.  (PTO at 4-5.)  Hibu has not included a single contention it intends to make, if any, regarding Mr. Peck's use of Hibu's supposedly "confidential and proprietary information," nor has Hibu identified any of the purported "confidential and proprietary information" supposedly at issue here.  Thus, any contention that Mr. Peck breached the Non-Disclosure Provision has been waived.  Moreover, any contention that Mr. Peck breached the Non-Disclosure Provision cannot survive summary judgment for the simple reason that there is no evidence that Mr. Peck had, used or disclosed any "confidential and proprietary" information belonging to Hibu after his termination.  (Peck Decl. ¶ 23.)

## II.   HIBU'S CLAIM FOR TORTIOUS INTERFERENCE WITH HIBU'S "BUSINESS EXPECTANCY" (COUNT II) FAILS AS A MATTER OF LAW.

In Count II of its Complaint, Hibu asserts a claim for tortious interference with its purported "business expectancy."  (Compl. ¶¶ 39-45.)  The elements of this claim are:  (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) a reasonable certainty that, except for the conduct of the defendant, plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) incurrence of damages by plaintiff as a direct and proximate result of defendant's misconduct. *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003).

Hibu advances two theories in support of its claim for tortious interference with business expectancy, the first of which is that Mr. Peck tortiously interfered with Hibu's relationships with its employees by "recruiting Hibu's experienced employees." (PTO at 9.) This claim fails as a matter of law because tortious interference with business expectancy does not apply to an at-will employment relationship. As this Court noted in *Jackson v. Kansas Cty. Ass'n Multiline Pool*, "several cases in this Court have held that an at-will employment relationship cannot support a tortious interference with a contract claim or a tortious interference with a business expectancy claim." No. 03-4181-JAR, 2006 WL 963838, at *19 (D. Kan. Apr. 10, 2006). The case of *Babbar v. Ebadi*, 36 F. Supp. 2d 1269, 1276 (D. Kan. 1998), illustrates the point. In *Babbar*, an untenured professor sued the faculty members of the university where he worked, claiming they interfered with his "prospective business advantage" of continued employment by failing to grant him tenure. *Id.* at 1276. The court granted summary judgment for defendants, holding that, as an untenured professor, he could not show "the existence of a business relationship or expectancy with the probability of future economic benefit" or that he was "reasonably certain to have continued his relationship with the University." *Id.*

The same logic applies here. The employment relationships with which Mr. Peck supposedly interfered were those of at-will Hibu employees who could leave Hibu, or be terminated by Hibu, at any time. Thus, like the professor in *Babbar*, Hibu cannot show "the existence of a business relationship or expectancy with the probability of future economic benefit." *Id.* at 1276. Nor can Hibu show that it was "reasonably certain" that Hibu would have continued its relationship with these at-will employees. *Id.* This is particularly true considering that Hibu itself terminated two of the Sales Representatives. (Flowers Decl. ¶ 8; Baker Decl. ¶ 7.)

31

Hibu's theory that Mr. Peck tortiously interfered with its relationship with Hibu's "experienced employees" fails for the additional reason that, as explained in Section I(A)(3), above, there is no evidence that Mr. Peck engaged in any improper solicitation of the Sales Representatives during the Restricted Period.

Hibu's other theory of tortious interference with business expectancy is that Mr. Peck "direct[ed]" the Sales Representatives to "indirectly solicit" their former Hibu customers in breach of their respective employment agreements with Hibu by "drop[ping] the name" of their previous Hibu sales representative during sales calls.  (PTO at 5.)  To begin, this is a dubious legal theory given that there is no allegation of any direct communications between Mr. Peck and the Hibu customers he supposedly induced not to do business with Hibu.  "Tortious interference with a prospective business relationship requires some type of communication ***between the defendant and the third party*** in which the defendant induces the third party not to engage in a prospective contract or business relation with the plaintiff."  *DP-Tek, Inc. v. AT&T Global Information Co.*, 891 F. Supp. 1510, 1520 (D. Kan. 1995).

Yet another fundamental problem for Hibu is that there is no evidence that any Hibu customer refused to enter into a business relationship with Hibu as a direct and proximate result of Mr. Peck's supposed interference.  *See TKO Energy Servs., LLC v. M-I L.L.C.*, No. 12-CV-108-GKF-PJC, 2013 WL 789458, at *10 (N.D. Okla. Mar. 4, 2013) (no tortious interference where plaintiffs "does not state that the customer[s] changed providers" as a result of defendants' conduct), *aff'd*, 539 F. App'x 866 (10th Cir. 2013); *Indiana Autobody Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 614CV6001ORL31TBS, 2016 WL 7183290, at *5 (M.D. Fla. Feb. 26, 2016) (granting summary judgment on tortious interference claim because there was no evidence that "any Plaintiff lost a single customer due to the actions" of defendants), *report and*

*recommendation adopted*, No. 614CV6001ORL31TBS, 2016 WL 3208396 (M.D. Fla. June 10, 2016); *Bruno Int'l Ltd. v. Vicor Corp.*, No. CV 14-10037-DPW, 2015 WL 5447652, at *18 (D. Mass. Sept. 16, 2015) (no tortious interference where "[t]he plaintiff could not connect lost customers to the defendant's improper acts").

Moreover, Hibu's far-fetched theory fails because, again, there is no evidence of any intentional misconduct by Mr. Peck.  In particular, Hibu has uncovered no evidence that Mr. Peck "direct[ed]" the Sales Representatives to breach their employment agreements.  Instead, the record is undisputed that Mr. Peck (and Dex Media) stressed ***at all times*** that the Sales Representatives had to abide by whatever obligations they owed to Hibu once they began working for Dex Media.  (Peck Decl. ¶¶ 20-21; *see* Kimbro Dep. 16:23-17:10; Flowers Dep. 195:11-17.)  In fact, when client accounts were first assigned to the Sales Representatives, Mr. Peck specifically prohibited any of the Sales Representatives from servicing an account that he or she had worked on while at Hibu.  (Peck Decl. ¶ 21; *see also* Kimbro Dep. 14:3-17; Flowers Dep. 19:10-24; Russell Dep. 126:9-127:5.)  And even after client accounts had been assigned, Mr. Peck continued to "reiterate" to the Sales Representatives in "multiple conversations" that they were not to indirectly solicit their Hibu customers.  (Ex. GG Peck Dep. 512:19-514:3.) There is simply no evidence that Mr. Peck ever "directed" any of the Sales Representatives to engage to do anything improper.

Hibu's claim for tortious interference with business expectancy fails for the additional reason that there is no evidence that Mr. Peck acted with "actual malice" toward Hibu.  Under Kansas law, "[t]he element of actual malice is required in both actions for tortious interference with contract and tortious interference with prospective business advantage." *Petroleum Energy v. Mid–America Petroleum*, 775 F. Supp. 1420, 1429 (D. Kan. 1991).  To satisfy this element,

Hibu must show that Mr. Peck acted with "evil-mindedness" and a "specific intent to injure" Hibu.  *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1165, 1209 (D. Kan. 1999).  Hibu cannot make such a showing.

Merely alleging that Mr. Peck solicited Hibu's employees or customers does not come close to establishing malice.  *See Matrai v. AM Entm't, LLC*, No. 14-2022-SAC, 2015 WL 1646214, at *8 (D. Kan. Apr. 14, 2015).  In *Matrai*, the Court dismissed plaintiff's tortious interference claim, holding that "merely alleging that [defendant] intentionally dissuaded the contracting party from going forward with the Plaintiffs' business relationship is insufficient to allege malice."  The Court continued:  "The complaint leaves open the possibility that Miller acted in his own self-interest without intent to harm, and thus fails to plead sufficient factual content that would allow the court to draw the reasonable inference that the defendant acted with evil intent, i.e., maliciously."  *Id.*  Like the allegations in *Matrai*, the evidence here "leaves open the possibility that [Mr. Peck] acted in his own self-interest without intent to harm" Hibu.  *Id.*  In fact, the evidence all but compels this conclusion, as it is undisputed that Mr. Peck waited until after the Restricted Period in the 2006 Agreement ended before recruiting any Hibu employees, implored the Sales Representatives to abide by their obligations to Hibu, and prohibited the Sales Representatives from soliciting their past accounts.  On this record, Hibu cannot show that Mr. Peck acted with "evil-mindedness" or "specific intent to injure" and, for this reason alone, the tortious interference claim should be dismissed.  *See Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1367 (D. Kan. 1997) (granting summary judgment where there was no evidence of "conduct of sufficient severity from which a reasonable jury might infer malice"); *Wichita Clinic*, 45 F. Supp. 2d at 1204-05 (granting summary judgment where "[t]he uncontroverted facts establish that the defendants were not acting with malice").

## CONCLUSION

For the foregoing reasons, Defendant Chad Peck respectfully requests that the Court enter summary judgment dismissing each of Plaintiff Hibu's claims with prejudice.

Dated:  August 2, 2017                    */s/ Lynn D. Preheim*

Lynn D. Preheim  (#13300)
Travis J. Quick (#26967)
STINSON LEONARD STREET LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, Kansas 67206-6620
Telephone (316) 265-8800
Facsimile (316) 265-1349
lynn.preheim@stinson.com
travis.quick@stinson.com

Eric F. Leon (admitted *pro hac vice*)
Kuan Huang (admitted *pro hac vice*)
Nathan Taylor (admitted *pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
eric.leon@lw.com
kuan.huang@lw.com
nathan.taylor@lw.com

*Counsel for Defendant Chad Peck*

CORE/3502715.0002/134395955.1

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2017, I caused the foregoing to be filed with the clerk of the court using the CM/ECF system which will send a notice to the following counsel of record:

Patrick L. Kenney
Russell J. Shankland
John M. Mattox II
Todd W. Ruskamp
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
pkenney@shb.com
rshankland@shb.com
jmattox@shb.com
truskamp@shb.com

*Attorneys for Plaintiff Hibu, Inc.*

*/s/ Lynn D. Preheim*

36