## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HIBU, INC.,

       Plaintiff,

v.

                                       Case No. 16-1055-JTM

CHAD PECK,

       Defendant.

## MEMORANDUM AND ORDER

Plaintiff hibu Inc. is a digital and print media marketing and advertising company. Plaintiff claims that defendant Chad Peck, a former employee, violated his employment agreement by soliciting plaintiff's customers and competing against it with a direct competitor, Dex Media. Plaintiff also alleges that defendant tortiously interfered with plaintiff's business expectancy and its employees' non-compete agreements. Defendant moves for summary judgment (Dkt. 255), and argues that plaintiff is not a party to the employment agreement and further that defendant did not violate the restrictions. For the reasons stated herein, defendant's motion is granted in part, and denied in part.

### I.      Uncontroverted Facts

The parties dispute the majority of underlying facts surrounding the events of this case.[1]  However, the following facts are uncontroverted, or to the extent they are disputed, taken in the light most favorable to plaintiff—the nonmoving party.

In 2006, defendant was employed as a sales manager with Yellow Book Sales and Distribution Company, Inc. ("Yellow Book S&D").  Defendant was responsible for overseeing a team of sales representatives tasked with selling advertising products to Yellow Book S&D's customers in Wichita and portions of Kansas.  Yellow Book S&D was a subsidiary of Yellow Book USA, Inc. ("YB USA").

 On May 23, 2006, defendant signed an agreement with YB USA (the "2006 Agreement").  The 2006 Agreement collectively referred to YB USA and its subsidiaries as the "Company" and contained several restrictions.

> Accordingly, you shall not, at any time while employed by the Company or after termination of employment, reproduce or use for your own purposes or disclose to anyone else, for any reason or purpose other than in furtherance of the Company's business, any Confidential and Proprietary Information.

(Dkt. 1-1, at 2).  Additionally, for a period of 12 months commencing on the date of termination, defendant agreed not to, in relevant part:

> directly or indirectly solicit, call upon or service, or in any other manner divert or take away or attempt to divert or take away from the Company, on your own behalf or on behalf of any third party, any customer whose account you serviced or supervised during the twelve (12) months immediately preceding termination of your employment.

---

[1] In his reply, defendant claims that plaintiff did not properly controvert defendant's statements of fact, and therefore, defendant's statements of fact should be deemed admitted.  District of Kansas Rule 56.1(a) allows a material fact to be deemed admitted unless it was specifically controverted by the statement of the opposing party.  Any controverting statement must fairly meet the substance of the matter asserted. D. Kan. R. 56.1(e).  The court finds that plaintiff's controverting statements in response fairly meet the substance of the matter asserted.

. . .

directly or indirectly engage or become interested in (a) any business in the Territory (as hereinafter defined) that engages in the yellow pages directory publishing business, or (b) any other business in the Territory that competes with the yellow pages directory publishing business or the internet advertising business of the Company. . . . "Territory" means those Yellow Book directory markets where you have been a manager at any time during the eighteen (18) month period immediately [preceding] the termination of your employment.

. . .

encourage or assist any of the Company's employees to leave the Company and you shall not directly or indirectly (on your own behalf or in cooperation with any other person or entity) employ or retain or solicit the employment or retention of any person who was an employee of the Company . . .

(Dkt. 1-1, at 2–3).

On June 23, 2009, YB USA filed an Amendment of Withdrawal with the Kansas Secretary of State, withdrawing its authority to transact business in Kansas. On March 31, 2011, YB USA merged with and into Yellow Book S&D. The Certificate of Ownership and Merger stated that "Subsidiary will possess all of Parent's property, rights, privileges and powers and will assume all of Parent's liabilities and obligations[.]" (Dkt. 256-13, at 4). Yellow Book S&D was the surviving corporation and YB USA ceased to exist. However, the surviving corporation changed its name to Yellowbook Inc. at the time of the merger. About two years later, the corporate name of Yellowbook Inc. became hibu Inc., the plaintiff in this case.

In January 2015, defendant's employment with plaintiff ended. Defendant held a sales position with All-States Exteriors for the first half of 2015. Defendant began

working with Dex Media in August 2015.  Under the 2006 Agreement, defendant's 12-month restricted period began on January 2, 2015, and ended on January 2, 2016.  Based on defendant's communications with Dex Media prior to his hiring and subsequent work on Dex Media's expansion into Wichita and other Kansas markets, plaintiff claims that defendant breached the 2006 Agreement and tortiously interfered with plaintiff's business expectancy.

## II.    Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006) (overruled on other grounds).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.  *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)).  The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

4

### III.    Discussion

#### A. Waiver

Defendant asserts that plaintiff waived several legal theories and factual claims by not preserving them in the pretrial order. "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Cortez v. Wal–Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006) (internal quotation marks omitted). However, "pretrial orders are to be 'liberally construed to cover any of the legal or factual theories that might be embraced by their language.'" *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)).

In the pretrial order, plaintiff quoted provisions of the 2006 Agreement that referenced defendant's agreements with the "Company." (Dkt. 251, at 3–4). As discussed below, plaintiff is the surviving corporation of the Company. While plaintiff did not specifically state that defendant signed an agreement with plaintiff's predecessor and/or that plaintiff succeeded to the rights of Company identified in the 2006 Agreement, the court finds that defendant had adequate notice of plaintiff's claims. *See Zenith Petroleum Corp.*, 656 F. App'x at 887 ("[T]he primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'"). Plaintiff is not attempting to assert an entirely new legal theory, and the court will not exclude plaintiff's claim from moving forward. *See Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D. Kan. 1998) ("Since it is intended to facilitate a trial on the merits, the pretrial order should not be used to

defeat the lawsuit on a technicality or be construed in the spirit of a common law pleading."); *Daneshvar v. Graphic Tech., Inc.*, 18 F. Supp. 2d 1277, 1288 n.15 (D. Kan. 1998) (omission of entire theory from pretrial order constitutes waiver, but omission of specific position is not fatal).

The court further finds that plaintiff has not asserted new legal theories with respect to its breach of contract claim.  Plaintiff alleges, "[a]s early as September 2015, Peck reached out, directly and indirectly, to his former colleagues at Hibu, including the six Hibu sales representatives and others, such as Chris Hett, to recruit them to Dex Media."  (Dkt. 251, at 4).

Likewise, plaintiff did not waive any claims with respect to its tortious interference claim.  Plaintiff alleged that defendant tortiously interfered with plaintiff's business expectancy.  Plaintiff also asserted that each of the six sales representatives recruited by defendant had signed similar employee agreements prohibiting them from soliciting, for a period of 12 months, plaintiff's customers they had serviced during the 12 months immediately preceding their termination.   Plaintiff alleged that under defendant's direction, "these sales representatives merely traded their former Hibu customers among themselves so as to create the illusion that they were not servicing or soliciting former customers in violation of their Employee Agreements."  (Dkt. 251, at 5).  Plaintiff's arguments in opposition to summary judgment match these claims.  As such, plaintiff did not waive any legal theories or factual contentions.

### B. Parties to the 2006 Agreement

Defendant claims that he entered into the 2006 Agreement with YB USA, not plaintiff. Defendant asserts that YB USA is a separate entity—thus, plaintiff cannot enforce the contract because there was not a valid agreement between plaintiff and defendant.

The parties agree that Kansas law governs the substantive issues in this case. Additionally, in diversity cases, "district courts generally apply the substantive law, including the choice-of-law rules, of the forum state. 'Under Kansas choice-of-law rules, the *lex loci contractus* doctrine requires the Court to apply the law of the state where the contract is made.'" *Servi-Tech, Inc. v. Olson*, No. 17-01148-EFM-JPO, 2017 WL 3839418, at *3 (D. Kan. Sept. 1, 2017).

In order to state a claim for breach of contract under Kansas law, plaintiff must establish that it was a party to the contract. *Shane v. Log Star Homes of Am., Inc.*, No. 6:14-CV-01273-JTM, 2016 WL 7242517, at *7 (D. Kan. Dec. 15, 2016). The 2006 Agreement stated that it was between YB USA and defendant, however, it collectively referred to itself and its subsidiaries as the "Company" throughout the 2006 Agreement. Defendant agreed not to compete and/or take away business from the Company, i.e. YB USA or its subsidiaries, for a period of 12 months after his employment was terminated. Thus, YB USA or a subsidiary of YB USA could enforce the 2006 Agreement. Defendant acknowledges this point in his reply.[2] (Dkt. 269, at 18).

---

[2] Defendant agrees that "[s]trictly construed, the Agreement can only be enforced by two entities: Yellow Book USA or a subsidiary of Yellow Book USA[,]" i.e. Yellow Book S&D. (Dkt. 269, at 18).

Furthermore, upon the merger, Yellow Book S&D possessed all of YB USA's property, rights, privileges, and powers.  Even if the 2006 Agreement did not collectively include Yellow Book S&D—plaintiff's predecessor—within the terms of the agreement, Yellow Book S&D was able to enforce the contract once it merged with YB USA.  This is consistent with Kansas law.  *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) ("Although an employee's duty to perform under an employment contract generally is not delegable, . . . the right to enforce a covenant not to compete generally is assignable in connection with the sale of a business[.]").  "In the case of a merger, as here, the surviving corporation automatically succeeds to the rights of the merged corporations to enforce employees' covenants not to compete."  *Id.*; *see also* Kan. Stat. Ann. § 17-6709(a) (upon merger or consolidation, "all such constituent corporations except the one into which the other or others of such constituent corporations have been merged . . . shall cease and the constituent corporations shall become a new corporation, or be merged into one of such corporations . . . possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of such corporations . . . shall be vested in the corporation surviving or resulting from such merger or consolidation").

The same is true under Delaware law, where the Certificate of Ownership and Merger was filed.  *Del. Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077–78 (Del. 2006); 8 Del. C. § 259.  "It is a fundamental principle of corporation

law that although a merged corporation ceases to exist, in the absence of a specific provision to the contrary, all property, rights, and privileges of the corporation continue as the property of the surviving entity." *Id.* (citing 8 Del. C. § 251(a)).

Defendant's argument that substituting plaintiff for YB USA as the counter-party to the 2006 Agreement would have somehow revived, altered, and/or broadened the restrictive covenants is also unpersuasive.  At the time defendant signed the 2006 Agreement, defendant's employer was Yellow Book S&D—the surviving corporation and predecessor to plaintiff.  Unlike YB USA, Yellow Book S&D did not cease to exist. The fact that YB USA withdrew its authority to transact business in Kansas is irrelevant as plaintiff is not the successor to YB USA.  Instead, plaintiff is the successor to Yellowbook Inc.  And Yellowbook Inc. is the successor to Yellow Book S&D after Yellow Book S&D absorbed YB USA.

Defendant references the anti-modification provision in the 2006 Agreement, which provides the agreement cannot be changed or terminated except by an agreement in writing signed by defendant and an officer of the "Company"—meaning Yellow Book S&D and YB USA, not solely YB USA.  After the merger, defendant's restrictions did not change because they also applied to Yellow Book S&D.  It is true that Yellow Book S&D "lost its status as a subsidiary of [YB] USA" the day it merged with YB USA.  (Dkt. 269, at 18).  But it was the surviving corporation.  Thus, it did not lose its ability to enforce the 2006 Agreement.

The 2006 Agreement was not modified nor were defendant's contractual obligations revived upon the merger of YB USA with and into Yellow Book S&D.

9

Defendant agreed not to compete with or solicit customers from Yellow Book S&D the day he executed the 2006 Agreement.  Because plaintiff is the surviving corporation following the merger of Yellow Book S&D and YB USA, it can enforce the 2006 Agreement against defendant.

### C.  Subsequent Agreements

Defendant claims that plaintiff had a protocol for employees to sign an agreement every 12 or 18 months.  Defendant testified that he signed two or three employment agreements after the 2006 Agreement, and argues the 2006 Agreement is not the controlling contract.

Plaintiff counters that there is no such protocol nor has defendant produced a copy of a subsequent employee agreement executed by defendant.  Plaintiff acknowledges that there is evidence that it sent employee agreements to defendant in July 2007, March 2011, and June 2014, in connection with changes in his position.  However, plaintiff's CEO, Kevin Jasper, stated, "[t]he Company is not aware of any later employee agreements signed by Peck and there is no evidence that he signed any later employee agreements."  (Dkt. 265-67, at 2).

At this stage, the court construes disputed material facts in favor of the nonmoving party.  Defendant says he signed subsequent agreements; plaintiff says he did not.  The court finds that a material issue of fact exists as to whether defendant signed subsequent employee agreements that would prevent plaintiff from enforcing the 2006 Agreement.

D.  Breach of Restrictions

*Employment with a direct competitor*

Plaintiff contends that defendant breached the 2006 Agreement when he went to work for a direct competitor within the one-year restricted period.  Defendant argues that non-compete agreements that restrict an employee from accepting employment with a competitor, without reference to the employee's job duties, are per se unreasonable and thus, unenforceable.  The court disagrees with both parties.

Kansas courts recognize "that customer contacts, special training of employees, trade secrets, confidential business information, loss of clients, good will, and reputation all qualify as legitimate business interests."  *Digital Ally, Inc. v. Corum*, No. 17-CV-02026-DDC-GLR, 2017 WL 1545671, at *8 (D. Kan. Apr. 28, 2017).  The court considers "the reasonableness of the time and territory restrictions" in comparing plaintiff's legitimate business interests with the restrictions.  *Id.*

Plaintiff had a legitimate business interest in protecting its relationships with its customers and confidential information related to those accounts.  The 2006 Agreement restricted defendant's employment with a competitor within the territory where defendant was a manager at any time during the 18-month period preceding his termination.  By signing the 2006 Agreement, defendant acknowledged that his agreement not to compete in certain markets, as set forth in paragraph 3 of the 2006 Agreement, "was reasonable in its geographic scope and time period, and will not prevent [defendant] from working in the yellow pages business or obtaining other employment."  (Dkt. 265-25, at 5).

11

Defendant cites *Digital Ally* in support of his position that the 2006 Agreement was unreasonable. The agreement at issue in *Digital Ally* is distinguishable because it prohibited the defendant from performing any type of service for any business or entity that could be considered plaintiff's competitor for two years. 2017 WL 1545671 at *11. Here, defendant's agreement is limited by territory and time—and is therefore not unreasonable. *See also Weber v. Tillman*, 259 Kan. 457, 465, 913 P.2d 84, 91 (1996) (Dr. Tillman "may practice dermatology anywhere and any time except within a limited territory and time."). Defendant's agreement did not completely prevent him from working with a competitor for an unreasonable amount of time.

On the other hand, the "territory" limitation cuts against plaintiff's allegations against defendant. From the time defendant became employed with Dex Media through the expiration of his restricted period, Dex Media was not a competitor in the Wichita area or surrounding markets—defendant's restricted territory. Therefore, defendant did not breach his agreement solely by working for Dex Media within the restricted period.

### Preparing to compete

It is undisputed that during the restricted period, defendant was preparing to expand Dex Media into the Wichita market. But the parties dispute whether preparing to compete violates the 2006 Agreement. As noted above, Dex Media was not currently competing in defendant's restricted territory from August 16, 2015, to January 2, 2016. Thus, the question before the court is whether defendant's planning to expand into the

Wichita market with Dex Media violates the 2006 Agreement.  The court finds that it does not.

The 2006 Agreement limits defendant from competing with a direct competitor "in the Territory."  As noted above, Dex Media was not "engag[ed] in the yellow pages directory publishing business, or . . . any other business in the Territory that compete[d] with the yellow pages directory publishing business or the internet advertising business of the Company" during defendant's restricted period.  (Dkt. 265-2, at 3).  As in *Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-1552JLR, 2006 WL 2401269, at *4 (W.D. Wash. Aug. 18, 2006), the court here construes the preceding language only to limit defendant's ability to work for a competitor, market, or sell a competing product in the Wichita and surrounding area markets.  Thus, the court finds that defendant's mere preparations for Dex Media's future expansion into the territory did not violate paragraph 3 of the 2006 Agreement.

*Solicitation of Plaintiff's Customers*

Plaintiff claims defendant solicited its customers in 2015 and thereafter in violation of the 2006 Agreement.  Plaintiff argues that Dex Media hired defendant as Director-Expansion Channel, and his job was to develop Kansas sales largely from his former customers.

The court has reviewed the record.  It is true that defendant strategically planned to solicit plaintiff's customers once his restricted period expired.  But there is no evidence that defendant diverted his former customers' business from plaintiff to Dex

Media between January 2, 2015, and January 2, 2016.[3]  For similar reasons addressed above, the court finds that preparing to solicit defendant's former customers during the restricted period does not equate to directly or indirectly soliciting his former customers.  Nor does it constitute the taking away, or attempted taking away, of customers from plaintiff.  Therefore, the court grants summary judgment on this claim.

*Disclosure of Confidential Information*

In the pretrial order, plaintiff claims defendant "used confidential and proprietary information to compete against [plaintiff]."  (Dkt. 251, at 9).  As noted above, the court liberally construes the pretrial order, and finds that this claim is preserved.

Defendant argues summary judgment is warranted because there is no evidence that he disclosed confidential information.  In footnote 108 of its response, plaintiff alleges that defendant possessed plaintiff's confidential information pertaining to customer information, pricing information, performance of sales representatives, and strategies for plaintiff's directories and products in relevant markets.  Mr. John Gregory, Dex Media's Vice President of Directory Marketing and Pricing, testified that there are no businesses buying yellow pages advertising for the first time and that the only way to increase yellow page revenue is to sell to existing yellow page advertisers.  Defendant had plaintiff's sales data that allowed Dex Media to create business pro formas for projected sales for its Kansas expansion.  Plaintiff also notes that another

---

[3] Defendant testified that in 2015, he did have some personal contact with plaintiff's customers who are friends.  Or he saw them at social events or used their businesses for his own personal affairs.  (Dkt. 265-31, at 4–5).  However, there is no evidence that defendant directly or indirectly solicited these customers to leave plaintiff during these social interactions.

sales representative, then employed by Dex Media, retained a banker's box of plaintiff's customers files and other confidential information.

In an email dated July 26, 2015, James McCusker, Dex Media's Chief Revenue Officer, asked Gregory when the directory plans for defendant's areas would be finished. (Dkt. 265-22, at 2). Gregory responded:

> Not even sure this week actually. We have the maps almost done, but then we have to pull the numbers of businesses, etc. When we did this at yellowbook we had all the competitor books keyed for revenue opportunities. It took 4 weeks to do all that work. If Joe wants a buttoned up plan, we are going to need more time, and I don't know how long, because I don't know what data we have around here and how hard it is to get.

In Mr. Jeffery Johanns's deposition, reference was made to defendant's active involvement with plaintiff's top 100 Wichita accounts and the fact that he knew the inside scope on most of those clients. (Dkt. 265-10, at 3). Johanns testified that although a competitor might have knowledge of the methods plaintiff utilized to scope its directories, it would not know the specifics as far as the amount of customers and money spent. Johanns pointed out how close the scoping of the directories were and stated "there's no way that the business plan that they came up with would have been done unless he had the confidential information available to him . . . ." (Dkt. 259-6, at 2).[4]

Based on Dex Media's desire for information regarding competitors' books and revenue opportunities coupled with defendant's inside knowledge of plaintiff's Wichita

---

[4] The court notes that plaintiff put some of the scope, the geographic territories on the book themselves. However, Johanns testified that this was done several years ago. (Dkt. 265-15, at 9).

accounts, the court determines that a reasonable jury could find defendant used and disclosed confidential information to benefit both himself and Dex Media.

*Solicitation of Plaintiff's Employees*

Defendant asserts that he did not solicit any of plaintiff's sales representatives or other employees to join him at Dex Media. In response plaintiff argues that defendant solicited Mr. Chris Hett in August 2015.

The record supports plaintiff's claim that defendant solicited Hett. In his deposition, Hett stated that "[i]n August 2015, I was recruited by Peck to work for Dex Media, Inc." (Dkt. 265-69, at 2). Hett stated that he contacted defendant, who referred him to Dex Media's HR person. Hett, however, did not switch to Dex Media and remained employed with plaintiff. Therefore, plaintiff cannot establish damages caused by defendant's solicitation of Hett during the restricted period. *See Amedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, No. 14-1357, 2015 WL 1912308, at *4 (D. Kan. Apr. 27, 2015) (one of the elements for establishing a claim for breach of the non-compete or non-solicitation covenants includes damages to the plaintiff caused by the breach).

Defendant was also prohibited from "encourag[ing] . . . any of the Company's employees to leave the Company . . . ." (Dkt. 1-1, at 3). Plaintiff argues that defendant's appearance at social gatherings with plaintiff's sales team was a pretext for soliciting them to join Dex Media.

In October 2015, defendant attended a social event in Salina, Kansas, where his wife, Brooke Peck, and other sales representatives for plaintiff were gathered to watch a game. Defendant also had lunch with two of plaintiff's sales representatives, Messrs.

Lance Flowers and Ricky Baker, in December 2015. Based on defendant's interaction and their discussions with Flowers, both Hett and Mike Ball got the impression that defendant was building a team for Dex Media.[5] (Dkt. 265-13, at 6–7; Dkt. 265-14, at 9–11). Hett believed that defendant recruited plaintiff's employees prior to January 4, 2016. (Dkt. 265-14, at 9).

Viewing all evidence and reasonable inferences in the light most favorable to plaintiff, the court concludes that a reasonable jury could find defendant's attendance and conduct at these two events was to encourage plaintiff's employees to leave their employment. Therefore, defendant's motion for summary judgment on this issue is denied.

### E. Tortious Interference

*Interference with a contract*

The elements for tortious interference with contract are: (1) the existence of a contract; (2) defendant's knowledge thereof; (3) his intentional procurement of its breach; 4) the absence of justification; and (5) resulting damage to plaintiff. *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1211 (D. Kan. 2004). Additionally, "[a]n action for tortious interference with a contract is predicated on malicious conduct by the

---

[5] The court understands defendant's hearsay argument, however, Ball's personal opinion or impression of the situation is not hearsay. Nor is Hett's personal belief. Regardless, the court does not find at this juncture that plaintiff will be not be able to present Flowers's statements in an admissible form at trial. "Parties may, for example, submit affidavits . . . despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016) (internal quotations omitted). Here, plaintiff can call Flowers as a witness at trial, which will resolve the hearsay issue. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.").

defendant." *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1200 (D. Kan. 1999).

Defendant cites a number of cases in support of his argument that plaintiff's sales representatives were at-will employees, thus it was not reasonably certain that plaintiff would gain future economic benefits from their continued employment. But plaintiff's tortious interference claim revolves around the sales representatives' alleged violation of their own restrictive covenants, not plaintiff's expectation that these individuals would remain plaintiff's employees.

### *Evidence of a breach*

"Interference with a contract requires proof of breach of a contract between the plaintiff and a third party." *L & M Enters., Inc. v. BEI Sensors & Sys., Co.*, 45 F. Supp. 2d 879, 886 (D. Kan. 1999), *aff'd sub nom. L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284 (10th Cir. 2000) ("[A]n action for tortious interference with contract does not extend to claims of adverse impact or increased burden which fall short of inducing or causing actual breach."). Each sales representative had his or her own non-compete agreement, which provided in part.

> [D]uring the period of your employment with the Company and thereafter, for a period of twelve (12) months commencing on the date of termination of your employment, you shall not directly or indirectly solicit, call upon or service, or in any other manner divert or take away or attempt to divert or take away from the Company, on your own behalf or on behalf of any third party, any customer whose account you serviced or supervised during the twelve (12) month period immediately preceding termination of your employment. You acknowledge and agree that your agreement as to non-solicitation of customers as set forth in this paragraph 2 is necessary for the protection of the Company's trade secrets and other Confidential and Proprietary Information, is reasonable, and will not

18

prevent you from working in the yellow pages business or obtaining other employment.

During the period of your employment with the Company and thereafter, for a period of twelve (12) months commencing on the date of termination of your employment, you shall not encourage or assist any of the Company's employees to leave the Company and you shall not directly or indirectly (on your own behalf or in cooperation with any other person or entity) employ or retain or solicit the employment or retention of any person who was an employee of the Company at any time during the twelve (12) months preceding the termination of your employment, and you shall not be associated with any person or entity that employs or retains any such person if you were involved in any way with the retention or employment of that person.

Defendant waited until January 4, 2016, before asking his former sales team to join him at Dex Media. One or two representatives left in mid-January, while others left in mid-February. Flowers and Baker left after plaintiff fired them.

Defendant's sales team began making sales calls on behalf of Dex Media in March 2016, and the first sale was made in April 2016. It is undisputed that defendant was in charge of assigning client accounts to his sales team at Dex Media. In doing so, defendant only assigned his sales representatives client accounts they had not serviced in the twelve months preceding their terminations.

Plaintiff claims that defendant merely swapped customer lists among the sales team. It also alleges that the sales representatives dropped names of the former representative who had serviced the client while employed with plaintiff. In doing so, the sales representative explained that the former representative could not contact them because of the 12-month non-compete restriction.

With respect to Baker and Flowers, plaintiff alleges that they threatened Ball that defendant would target and take his customers if he did not join Dex Media. (Dkt. 265-13, at 12–13). Ball testified that he had conversations with both Baker and Flowers about leaving plaintiff to go work with defendant at Dex Media. (Dkt. 265-13, at 10).

Plaintiff alleges that the sales representatives used plaintiff's confidential customer information and records. Plaintiff states that Ms. Monica Russell returned a banker's box of confidential customer information almost a year after she had joined Dex Media. In this box, were customer files; rate cards showing pricing information; detailed customer notes; and other confidential and proprietary information belonging to plaintiff, which pertained to customers in the relevant Kansas markets. Plaintiff alleges that the sales representatives used plaintiff's confidential customer information and records.

The court finds that a reasonable jury could decide that the sales representatives breached their employee agreements. Thus, the court next considers whether defendant's actions aided in these contractual breaches.

*Defendant's actions*

Defendant knew about these non-compete agreements. However, the parties dispute whether defendant intentionally, and maliciously, procured the breach of the sales representatives' non-compete agreements without justification.

Plaintiff must show defendant acted with legal malice—not actual malice[6]—which is "the intent to do harm without any reasonable justification or excuse." PIK 4th 103.05. *See also* PIK 4th 124.91, Notes on Use ("Based on the language in the *Turner* opinion[7], the Committee believes that legal malice, and not actual malice, is still the required element for claims of tortious interference that do not involve defamation, a qualified privilege or other claims or defenses having constitutional underpinnings."). "Justification exists when the defendant acts in the exercise of a right equal to or superior to that of the plaintiff and used fair means and good faith for some lawful interest or purpose." PIK 4th 124.93. In determining whether the interference was justified, the court considers the following factors:

> 1. the nature of the defendant's conduct;
> 2. the defendant's motive;
> 3. the interests of the plaintiff with which the defendant's conduct interfered;
> 4. the interests sought to be advanced by the defendant;
> 5. the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;
> 6. the proximity or remoteness of the defendant's conduct to the interference; and
> 7. the relations between the parties.

*Id.*

It is no secret that defendant intended to hire his former sales team, solicit plaintiff's customers, and compete with plaintiff. Within a few weeks after switching to

---

[6] The parties dispute whether plaintiff must show actual or legal malice. The court has reviewed relevant case law within this district, and finds that it is somewhat at odds with Kansas's most recent PIK instructions. The PIK Committee reviewed the case authority and specifically found that actual malice is only required in certain circumstances not applicable here.

[7] *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986).

Dex Media, defendant assigned his sales representatives their customer lists and they began calling plaintiff's customers. Defendant claims that he instructed his sales team to abide by any obligations owed to plaintiff. But the court has reviewed the record, and finds evidence that his sales team did not follow his direction.[8]

In an email dated July 11, 2016, Ms. Kari Kimbro told a customer "I know Lance told me you called him few times with changes and he sent them to home office. I hope they got made for you." (Dkt. 265-60, at 2).

There were a few accounts where Russell asked the former sales representative for the contact name on the account. (Dkt. 265-61, at 49).

Bradley Winfrey testified that when he spoke to a sales representative who would be contacting a former customer, he told the sales representative to tell the customer "hi." (Dkt. 265-62, at 5). Winfrey also stated that a couple days after a different sales representative, Baker, contacted his former customer, the customer called Winfrey and inquired if Dex Media was a real company. Winfrey responded "Yes" but that he could not talk about it because of his employee agreement. (Dkt 265-62, at 9–10). However, some months later, that same customer called Winfrey when he had an issue with a Dex Media product he purchased from Baker. Winfrey did not tell the customer

---

[8] Although not argued by the parties, the court finds that general agency liability could be relevant in this instance. The liability of a principal for the negligent acts of his agent is determined by whether the agent was engaged in the furtherance of the principal's business to such a degree that the principal had the right to direct and control the activities of the agent. *Hughes v. Jones*, 206 Kan. 82, 87–88, 476 P.2d 588, 592–93 (1970). Here, defendant's sales team was acting under defendant's supervision, he had control of their activities, and it furthered Dex Media's business. The court finds that a reasonable jury could find defendant had, at the very least, constructive knowledge of his sales team's actions.

to contact Baker; instead Winfrey informed Baker about the customer's problem.  (Dkt. 265-62, at 11).

Although it is close call, the record contains sufficient evidence that a reasonable jury could find defendant's sales team indirectly serviced its former customers or helped them with their accounts at Dex Media.  Defendant's ultimate goal with Dex Media was to hire his sales team from plaintiff and expand into his former territory. Defendant argues that he acted in his own self-interest without intent to harm plaintiff. However, Johanns testified that defendant knew his timing in recruiting the Wichita team would put plaintiff in a tremendous bind.  (Dkt. 259-6, at 2).  Because "[d]efendant['s] motive and the presence or absence of justification (or malice) are typically questions for the jury[,]" *Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1215, 1229 (D. Kan. 2016), the court denies summary judgment on this claim.

*Interference with business expectancy*

To succeed on a claim of tortious interference with business expectancy or relationship, plaintiff must show:

> 1. the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;
> 2. knowledge of the relationship or expectancy by the defendant;
> 3. that, except for the conduct of the defendant, the plaintiff was reasonably certain to have continued the relationship or realized the expectancy;
> 4. intentional misconduct by the defendant; and
> 5. damages suffered by the plaintiff as a result of defendant's misconduct.

PIK 4th 124.92.  Once again, under these circumstances, plaintiff must prove defendant acted with legal malice.  *Id.*

Defendant was aware of plaintiff's business relationships with defendant's former customers in the Wichita and surrounding area markets. Furthermore, it is reasonable to conclude that plaintiff would have maintained these relationships during 2016 as several accounts were up for renewal. Hett stated that he created a spreadsheet representing multiple customers that ceased doing or reduced their business with plaintiff because of defendant's and his sales team's actions. (Dkt. 265-70, at 2). Although defendant argues that telephone book sales were declining in 2016, there is no evidence that all of plaintiff's customers in the relevant markets withdrew their business because of the general decline.

Defendant, along with his sales team, intended to take over plaintiff's customers in the Wichita and surrounding area markets. Kimbro stated in an email to one of plaintiff's customers that "[w]e hope to take over [plaintiff's] market share eventually[.]" (Dkt. 265-57, at 2).

On June 24, 2016, Kimbro emailed a different customer requesting that the customer wait on renewing its contract with plaintiff until she had a chance to meet with the customer in August. (Dkt. 265-58, at 2).

On June 30, 2016, Kimbro wrote, "I don't know how they will contact you for renewal as they no longer have any personnel." (Dkt. 265-63, at 2). Kimbro also provided the customer with a list of prices, and noted that she knew these prices were considerably less than what the customer was currently paying plaintiff.

In another email, Kimbro stated, "I know Brad and Bob Groth both say hello! Bob quit Yellowbook a few years ago and Brad is working with me at Dex Media so

Yellowbook doesn't even have sales reps left.  If you want to deal with a person instead of a phone call, you will want to switch to us.  They are just starting the northwest ks yellowbook renewals so this is a great time to drop them if you want less cost!"  (Dkt. 265-64, at 2).

On July 5, 2016, Kimbro's email to another plaintiff customer detailed, "[t]here are several reasons we switched which we can discuss later."  (Dkt. 265-59, at 2).  She further stated, "[p]lease let me know if you have any interest.  Our pricing is very good compared to theirs and we want to earn your business away from them."  *Id.*

Again, the question is whether defendant committed intentional misconduct versus general competition.  The court has reviewed the record and concludes that a reasonable jury could find intentional misconduct.  Not only did defendant's sales team inform plaintiff's customers that Dex Media was trying to earn away plaintiff's business, they specifically told customers that plaintiff no longer had a team within their region—a fact that was false.  (Dkt. 265-62, at 6).  Additionally, there is evidence to support plaintiff's claim that defendant tortiously interfered with the sales representatives' non-compete agreements, which aided his efforts in soliciting plaintiff's customers.  Therefore, summary judgment is denied on this claim.

## IV.    Conclusion

The court finds that plaintiff is a party to the 2006 Agreement and can enforce the restrictions against defendant.  However, because defendant only prepared to compete with Dex Media in his former territory, he did not the breach non-compete or non-solicitation provisions of the 2006 Agreement.  On the other hand, the court finds that a

reasonable jury could find defendant violated his non-disclosure provision.  Likewise, a reasonable jury could find that defendant solicited plaintiff's employees.  The court also finds that plaintiff's claims of tortious interference with its non-compete agreements with its sales representatives and business expectancy with its customers should proceed to trial.

IT IS THEREFORE ORDERED this 15th day of November, 2017, that defendant's motion for summary judgment (Dkt. 255) is denied in part, and granted in part as to plaintiff's breach of contract claim (Count I).  Defendant is entitled to summary judgment on plaintiff's claims that defendant violated the non-competition and non-solicitation of customers provisions.  Defendant's motion is denied as to plaintiff's claims that defendant violated the non-disclosure of confidential information and non-solicitation of plaintiff employees provisions.

IT IS FURTHER ORDERED that defendant's motion is denied as to plaintiff's claims of tortious interference (Count II).

 s/ J. Thomas Marten
J. Thomas Marten, Judge